MOTION PICTURE ADVERTISING SERV-ICE CO., Inc. v. FEDERAL TRADE COMMISSION.

No. 13493.

United States Court of Appeals
Fifth Circuit.

Feb. 21, 1952.

634

Louis L. Rosen, New Orleans, La., for petitioner.

J. B. Truly, Jno. W. Carter, Jr., W. T. Kelley, Gen. Attys., Counsel, James W. Cassedy, Asst. Gen. Counsel, Federal Trade Commission, Washington, D. C., for respondent.

Before HOLMES, BORAH, and STRUM, Circuit Judges.

HOLMES, Circuit Judge.

This is a proceeding under Section 5 of the Federal Trade Commission Act, 15 U.S.C.A. § 41, wherein the petitioner is charged with engaging in unfair methods of competition in commerce by entering into long-time exclusive screening agreements. The defense is, first, a plea of *res judicata* and, second, a denial that the alleged exclusive agreements have a tendency or effect unduly to lessen, restrain, suppress, or injure, competition in the distribution or exhibition of advertising films in motion picture theatres. The plea of *res judicata* was overruled by the Commission, and the case tried upon its merits.

There is no charge in the complaint of any combination or conspiracy; the sole charge is that the petitioner, individually, has been guilty of an unfair method of competition within the intent and meaning of the act. The Commission found the petitioner guilty as charged, and ordered it to cease and desist in the future from entering into theatre screening agreements for a term in excess of one year; and also to discontinue in operation or effect any exclusive theatre screening provisions in existing contracts when the unexpired term thereof extended for a period of more than one year from the date of the service of the cease and desist order. Three separate and similar complaints were issued at the same time against three other corporations engaged in the same business. The cases were tried together under a stipulation that need not be fully stated here, but that was intended to avoid the necessity of having certain witnesses repeat their testimony.

Passing the question of *res judicata,* we proceed to a consideration and determination of the case on its merits. In the conduct of its business, the respondent enters

into written screening agreements with exhibitors for a maximum period of five years, the majority being written for terms of one year or two years. About 25 per cent of petitioner's screening agreements are for a period of five years. These agreements provide that the exhibitor shall properly display advertising films supplied by petitioner, return such films at the end of the screening period, and that the petitioner will pay the exhibitor each month for screening as designated in the contract. A substantial number of the contracts provide that the exhibitor will display only advertising films furnished by petitioner, except slides for charitable or governmental organizations or announcements of the theatre's coming attractions. The available space for screening advertisements is limited, as only about 60 per cent of the theatres accept film advertising; in addition, theatre patrons resent the showing of too much of this character of advertising, and thus impose economic barriers on the amount that may be run. The time consumed that will be tolerated by the public is said to be from three to six minutes, or from two to four per cent of the time consumed by the show.

The Commission concluded that an exclusive screening agreement for a period of one year was not an undue restraint on competition, but that such agreement for a longer period should be prohibited. The record shows that there is free and open competition among the distributors to secure such agreements, and that, from the beginning of the industry, distributors have sought and obtained exclusive screening agreements. The Commission having determined that exclusive agreements are not unfair or illegal *per se* but are necessary for the operation of the business, we are confronted with preponderating testimony that no prudent person would invest sufficient capital in the business without assurance of exclusive screening space for a longer period than one year; and that theatres themselves frequently demand guaranties for a longer period, or otherwise refuse to exhibit motion picture advertisements. As pointed out by the dissenting member of the Commission, the prohibition runs to the length of the lease rather than to its terms. We quote further from the dissent as follows:

"To understand the subject of this litigation one must know what trailer ads are because we are here concerned with the leasing of screen time in theatres for the exhibition of respondent's trailer ads. * * Generally, people believe any form of advertising in a place of amusement is a bore and ought to be done away with. The small theatre owner benefits from trailer ads. He is paid to show them. Features, news reels, and shorts, cost him money. However, trailer ads actually reverse the flow of film money back into his own till.

"The order in this case prohibits the trailer ad maker from leasing screen time from a theatre owner for a greater period than one year. If we could do this, it might be a great favor to audiences. Unfortunately, the privilege of boring the public for pay is a theatre owner's inalienable right, provided he doesn't carry the thing too far.

"People know trailer ads help eke out an existence for the small exhibitor. It's sort of a subsidy to keep the marginal operator alive. This is why audiences in small towns and communities sit quietly every night whilst the community theatre parades a variety of commercial plugs across the screen.

"I do not believe we should prohibit a theatre owner from leasing exclusive space in his lobby, his basement, his roof or even on his screen for as long as he wants, provided the subject matter of the ad is legal. Yet that is in actual effect what the order here does. It restricts one class of persons (trailer ad distributors) from buying what another class (theatre owners) may want to sell, namely a lease for more than one year. . . . As I pointed out at the beginning, trailer ads are a source of income to small theatres. The large and powerful movie house disdains to use such films. As a consequence, any restriction on the right to lease screen time affects only small businessmen. For them, it may be that portion of income which represents the difference between profit and loss. I think the question as to whether a long or short

lease is the better should be left to the judgment of the small businessman. At least I would like him to have the privilege of choice. Nowhere in our 43 volumes of decisions can I find where we have held a one-year lease was legal but that the same lease for a longer period was an unfair act or practice in commerce. * * *

"When the Federal Trade Commission gets into determining how long an ad taker's lease shall run, we open up an astonishing new field of activity for us and one that we might well wish ourselves out of before we hear the end of it.

"On the one hand we have litigation against a can company doing a fifth of a billion dollars worth of business a year (the biggest in the world), and controlling over 46 per cent of the 'competition.' (if such it be) in the sale of cans. [United States v. American Can Co., D.C., 87 F. Supp. 18.] The majority opinion written to apply to the four companies sued states: 'The total number of exclusive agreements held by respondents in the aggregate approximated 75% of total number.' To carry this reasoning a step further, if the F. T. C. had sued all the film ad companies we could justify anti-monopoly orders against a tyro with two dollars worth of annual business on the grounds that he with all others approximated 100% of the total industry."

■ It is self-evident, we think, that the theatre owner is entitled to choose his own distributor, and to sell, assign, lease, or give, his space for any purpose that he sees fit, subject to the police power of the state or federal government. In the instant case, because a large number of these films are transported in interstate commerce, the constitutional power of the United States to regulate commerce, and the statutes enacted in pursuance thereof, govern our decision. The ultimate determination of what constitutes unfair competition is for the court, not for the Commission; and the same rule must apply when the charge is that leases, sales, agreements, or understandings, substantially lessen competition or tend to create a monopoly. Federal Trade Commission v. Curtis Publishing Co., 260 U.S. 568-580, 43 S.Ct. 210, 67 L.Ed. 408.

■ The court must inquire whether the Commission's findings of fact are supported by substantial evidence; if so, they are conclusive; but as the statute grants jurisdiction to this court to affirm, modify, or set aside, any order of the Commission, it is our duty to examine the whole record; and, if from all the facts as found by the Commission, it clearly appears that no additional fact-findings are necessary and that, in the interest of justice, the controversy should be decided without further delay, the court has full power under the statute to decide the case and to affirm, modify, or set aside the order under review. 15 U.S.C.A. § 45(c). Cf. Universal Camera Corp. v. N. L. R. B., 340 U.S. 474, 71 S.Ct. 456, 95 L.Ed. 456.

■ The petitioner's solicitation and obtaining of exclusive theatre screening agreements are methods of competition in commerce, but the proof has failed to establish that they are unfair or that their prohibition would be in the public interest. Thus there are absent two distinct prerequisites to the power of the Commission to issue its order in this case to cease and desist. Cf. Federal Trade Commission v. Raladam Company, 283 U.S. 643, 646, 648, 51 S.Ct. 587, 75 L.Ed. 1324.

In another aspect, we have here a contract of agency, and our decision is governed by Federal Trade Commission v. Curtis Publishing Co., 260 U.S. 568, 43 S.Ct. 210, 67 L.Ed. 408. In a strict legal sense, the theatre owners and operators have not sold or leased the petitioner any screening space, nor granted it any easement thereto; they are not the lessors or vendors of anything; it is the distributor who furnishes the films by bailment to the exhibitor. It is different from an easement for an advertisement on a lot or building where the sign is erected by the advertiser, and the owner merely grants the right to put it there. Here the distributor has no right to enter the theatre and operate the machine or display the advertisements; he has a contract for personal services, which the exhibitor is obligated to perform. The

exhibitor agrees properly to display the advertisements at the rates and as provided in the screening agreement; and, with the exceptions stated, not to display any advertising films other than those furnished by the distributor. In other words, the exhibitor agrees to perform a specified service, for a stated period, at an agreed rate of compensation, and not to undertake the same service for any other distributor during the same period.

If it appears at any time in the course of a proceeding such as this that it is not in the public interest, the Commission should dismiss the complaint. If the Commission fails to do it, "the court should, without inquiry into the merits, dismiss the suit." Federal Trade Commission v. Klesner, 280 U.S. 19, 30, 50 S.Ct. 1, 4, 74 L.Ed. 138, 68 A.L.R. 838, 846. We have not exercised this power but have decided the case on its merits, though it does not appear to be in the public interest to increase the number or amount of advertisements of this character. The Federal Trade Commission Act was not passed to protect private rights, and it did not enlarge or change the definition of unfair methods of competition as laid down by the courts prior to its enactment. Federal Trade Commission v. Klesner, supra.

Let the business of petitioner be legitimate; let its method of conducting it be open, honest, without substantial monopolistic tendancy, and free from deceptive acts and practices; all of which is presumed to be true, and which presumption is not rebutted by the evidence: then no means that are just, truthful, reasonable, and requisite to the successful operation of the business, are unfair methods of competition in commerce in violation of the Federal Trade Commission Act.

Therefore, with available space and time for advertisements on the screen of motion-picture exhibitors severely limited, and with the business of distributors, by its nature, making it necessary that they have an assured outlet for a reasonable time for the screening of their prospective advertisements, we conclude that petitioner's method of soliciting and obtaining ex-clusive contracts with exhibitors for longer periods than one year was not unfair or unreasonable, but was rendered desirable and necessary by good-business acumen and ordinarily prudent management. Consequently, the cease and desist order of the Commission is set aside and the complaint dismissed. Goldberg v. Tri-State Theatre Corp., 8 Cir., 126 F.2d 26; United States v. Western Union Telegraph Co., D.C., 53 F.Supp. 377; State For Use of Independence County v. Tad Screen Advertising Co., 199 Ark. 205, 133 S.W.2d 1.

It is so ordered.