# FEDERAL TRADE COMMISSION *v.* MOTION PICTURE ADVERTISING SERVICE CO., INC.

No. 75. Argued December 8, 1952.—Decided February 2, 1953.

*James L. Morrisson* argued the cause for petitioner. With him on the brief were *Acting Solicitor General Stern, Acting Assistant Attorney General Clapp, Charles H. Weston* and *W. T. Kelley.*

*Louis L. Rosen* argued the cause for respondent. With him on the brief were *Charles Rosen* and *William B. Cozad.*

MR. JUSTICE DOUGLAS delivered the opinion of the Court.

Respondent is a producer and distributor of advertising motion pictures which depict and describe commodities offered for sale by commercial establishments. Respondent contracts with theatre owners for the display of these advertising films and ships the films from its place of business in Louisiana to theatres in twenty-seven states and the District of Columbia. These contracts run for terms up to five years, the majority being for one or two years. A substantial number of them contain a provision that the theatre owner will display only advertising films furnished by respondent, with the exception of films for charities or for governmental organizations, or announcements of coming attractions. Respondent and three other companies in the same business (against which proceedings were also brought) together had exclusive arrangements for advertising films with approximately three-fourths of the total number of theatres in the United States which display advertising films for compensation. Respondent had exclusive contracts with almost 40 percent of the theatres in the area where it operates.

The Federal Trade Commission, the petitioner, filed a complaint charging respondent with the use of "unfair methods of competition" in violation of § 5 of the Federal Trade Commission Act, 38 Stat. 717, 719, 52 Stat.

111, 15 U. S. C. § 45. The Commission found that respondent was in substantial competition with other companies engaged in the business of distributing advertising films, that its exclusive contracts have limited the outlets for films of competitors and have forced some competitors out of business because of their inability to obtain outlets for their advertising films. It held by a divided vote that the exclusive contracts are unduly restrictive of competition when they extend for periods in excess of one year. It accordingly entered a cease and desist order which prohibits respondent from entering into any such contract that grants an exclusive privilege for more than a year or from continuing in effect any exclusive provision of an existing contract longer than a year after the date of service in the Commission's order.[1]  47 F. T. C. 378. The Court of Appeals reversed, holding that the exclusive contracts are not unfair methods of competition and that their prohibition would not be in the public interest.  194 F. 2d 633.

The "unfair methods of competition," which are condemned by § 5 (a) of the Act, are not confined to those that were illegal at common law or that were condemned by the Sherman Act. *Federal Trade Commission* v. *Keppel & Bro.,* 291 U. S. 304. Congress advisedly left the concept flexible to be defined with particularity by the myriad of cases from the field of business. *Id.,* pp. 310–312. It is also clear that the Federal Trade Commission Act was designed to supplement and bolster the Sherman Act and the Clayton Act (see *Federal Trade Commission* v. *Beech-Nut Co.,* 257 U. S. 441, 453)—to stop in their incipiency acts and practices which, when full blown,

---

[1] Comparable findings and like orders were entered in each of the three companion cases. *In the Matter of Reid H. Ray Film Industries,* 47 F. T. C. 326; *In the Matter of Alexander Film Co.,* 47 F. T. C. 345; *In the Matter of United Film Ad Service, Inc.,* 47 F. T. C. 362.

would violate those Acts (see *Fashion Guild* v. *Federal Trade Commission,* 312 U. S. 457, 463, 466), as well as to condemn as "unfair methods of competition" existing violations of them. See *Federal Trade Commission* v. *Cement Institute,* 333 U. S. 683, 691.

The Commission found in the present case that respondent's exclusive contracts unreasonably restrain competition and tend to monopoly. Those findings are supported by substantial evidence. This is not a situation where by the nature of the market there is room for newcomers, irrespective of the existing restrictive practices. The number of outlets for the films is quite limited. And due to the exclusive contracts, respondent and the three other major companies have foreclosed to competitors 75 percent of all available outlets for this business throughout the United States. It is, we think, plain from the Commission's findings that a device which has sewed up a market so tightly for the benefit of a few falls within the prohibitions of the Sherman Act and is therefore an "unfair method of competition" within the meaning of § 5 (a) of the Federal Trade Commission Act.

An attack is made on that part of the order which restricts the exclusive contracts to one-year terms. It is argued that one-year contracts will not be practicable. It is said that the expenses of securing these screening contracts do not warrant one-year agreements, that investment of capital in the business would not be justified without assurance of a market for more than one year, that theatres frequently demand guarantees for more than a year or otherwise refuse to exhibit advertising films. These and other business requirements are the basis of the argument that exclusive contracts of a duration in excess of a year are necessary for the conduct of the business of the distributors. The Commission considered this argument and concluded that, although the exclusive contracts were beneficial to the distributor and preferred

by the theatre owners, their use should be restricted in the public interest. The Commission found that the term of one year had become a standard practice and that the continuance of exclusive contracts so limited would not be an undue restraint upon competition, in view of the compelling business reasons for some exclusive arrangement.[2] The precise impact of a particular practice on the trade is for the Commission, not the courts, to determine. The point where a method of competition becomes "unfair" within the meaning of the Act will often turn on the exigencies of a particular situation, trade practices, or the practical requirements of the business in question. Certainly we cannot say that exclusive contracts in this field should have been banned in their entirety or not at all, that the Commission exceeded the limits of its allowable judgment (see *Siegel Co.* v. *Federal Trade Commission,* 327 U. S. 608, 612; *Federal Trade Commission* v. *Cement Institute,* 333 U. S. 683, 726–727) in limiting their term to one year.[3]

---

[2] The Commission said: "Under the general practice the representative of the respondent first contacts the theater to determine if space is available for screen advertising and makes such arrangements as conditions warrant with respect to such space. In this way respondent's representative is able to show prospective advertisers where space is available. In contacting the theater it is necessary for the respondent to estimate the amount of space it will be able to sell to advertisers. Since film advertising space in theaters is limited to four, five, or six advertisements, it is not unreasonable for respondent to contract for all space available in such theaters, particularly in territories canvassed by its salesmen at regular and frequent intervals.

"It is therefore the conclusion of the Commission in the circumstances here that an exclusive screening agreement for a period of 1 year is not an undue restraint upon competition." 47 F. T. C., at 389.

[3] A suggestion is made that respondent needs a period longer than one year in view of the fact that the contracts with advertisers are often not coterminous with the exclusive screening agreements, due

The Court of Appeals held that the contracts between respondent and the theatres were contracts of agency and therefore governed by *Federal Trade Commission* v. *Curtis Publishing Co.*, 260 U. S. 568. This was on the theory that respondent furnishes the films by bailment to the exhibitors in exchange for a contract for personal services which the exhibitors undertake to perform. But the *Curtis* case would be relevant here only if § 3 of the Clayton Act [4] were involved. The vice of the exclusive contract in this particular field is in its tendency to restrain competition and to develop a monopoly in violation of the Sherman Act. And when the Sherman Act is involved the crucial fact is the impact of the particular practice on competition, not the label that it carries. See *United States* v. *Masonite Corp.*, 316 U. S. 265, 280.

Finally, respondent urges that the sole issue raised in the Commission's complaint had been adjudicated in a former proceeding instituted by the Commission which resulted in a cease and desist order. 36 F. T. C. 957.

---

in large part to the delays in obtaining advertising contracts after the exclusive screening agreements have been executed. The Commission rejected this contention, stating that by custom and by the terms of the exclusive contracts the theatre completes the screening of advertisements as required by the advertising contracts, even though those contracts extend beyond the expiration date of the exclusive screening agreement. We have concluded that the order which the Commission entered in this case is consistent with that construction. It does not prevent the completion of any particular advertising contract after the expiration of the exclusive screening agreement. The order merely prevents respondent from requiring the theatre owner to show only its films after that date. It does not prevent the theatre owner from making an otherwise exclusive agreement with another distributor at that time. No theatre owner is a party to this proceeding. The cease and desist order binds only respondent.

[4] This section makes unlawful a lease, sale, or contract for sale which substantially lessens competition or tends to create a monopoly. 15 U. S. C. § 14.

But that was a proceeding to put an end to a conspiracy between respondent and other distributors involving the use of these exclusive agreements. The present proceeding charges no conspiracy; it is directed against individual acts of respondent. The plea of *res judicata* is therefore not available since the issues litigated and determined in the present case are not the same as those in the earlier one. Cf. *Tait* v. *Western Maryland R. Co.*, 289 U. S. 620, 623.

*Reversed.*

MR. JUSTICE FRANKFURTER, whom MR. JUSTICE BURTON joins, dissenting.

My doubts that the Commission has adequately shown that it has been guided by relevant criteria in dealing with its findings under § 5 of the Federal Trade Commission Act are dispelled neither by those findings nor by the opinion of the Court. The Commission has not explained its conclusion with the "simplicity and clearness" necessary to tell us "what a decision means before the duty becomes ours to say whether it is right or wrong." *United States* v. *Chicago, M., St. P. & P. R. Co.*, 294 U. S. 499, 510, 511.

My primary concern is that the Commission has not related its analysis of this industry to the standards of illegality in § 5 with sufficient clarity to enable this Court to review the order. Although we are told that respondent and three other companies have exclusive exhibition contracts with three-quarters of the theaters in the country that accept advertising, there are no findings indicating how many of these contracts extend beyond the one-year period which the Commission finds not unduly restrictive. We do have an indication from the record that more than half of respondent's exclusive contracts run for only one year; if that is so, that part of respondent's hold on the market found unreasonable by the

Commission boils down to exclusion of other competitors from something like 1,250 theaters, or about 6%, of the some 20,000 theaters in the country. The hold is on about 10% of the theaters that accept advertising.

Apart from uncritical citations in the brief here,[1] the Commission merely states a dogmatic conclusion that the use of these contracts constitutes an "unreasonable restraint and restriction of competition." *In re Motion Picture Advertising Service Co.,* 47 F. T. C. 378, 389. The Court's opinion is merely an echo of this conclusion and states without discussion that such exclusion from a market without more "falls within the prohibitions of the Sherman Act" because, taken with exclusive contracts of other competitors, 75% of the market is shut off. But there is no reliance here on conspiracy or concerted action to foreclose the market, a charge that would of course warrant action under the Sherman Law. Indeed, we must assume that respondent and the other three companies are complying with an earlier order of the Commission directed at concerted action. See *In re Screen Broadcast Corp.,* 36 F. T. C. 957. While the existence of the other exclusive contracts is, of course,

---

[1] The decisions of this Court relied on do not dispose of this case. In *International Salt Co.* v. *United States,* 332 U. S. 392, we dealt with the largest producer of salt for industrial purposes, who by means of tying agreements rather than exclusive contracts, attempted an undue extension of his patent monopoly. Apart from these differences, it deserves to be noted that salt sales in one year amounted to $500,000 by the patentee. To the extent that that decision is predicated on a Sherman Law violation, it seems inapplicable here. In *United States* v. *Yellow Cab Co.,* 332 U. S. 218, apart from other differences, conspiracy was charged to shut off a substantial share of the market permanently by means of vertical integration. *United States* v. *Pullman Co.,* 50 F. Supp. 123, in which many other factors were present and the share of the market considerable, was affirmed by an equally divided Court. 330 U. S. 806.

not irrelevant in a market analysis, see *Standard Oil Co.*
v. *United States,* 337 U. S. 293, 309, this Court has never
decided that they may, in the absence of conspiracy, be
aggregated to support a charge of Sherman Law viola-
tion. Cf. *id.,* at 314. If other factors pertinent to a
Sherman Law violation were present here, the Commis-
sion could not leave such factors unmentioned and simply
ask us to review a broad unexplained finding that there
is such a violation.[2] In any event, the Commission has
not found any Sherman Law violation.

But we are told, as is of course true, that § 5 of the
Federal Trade Commission Act comprehends more than
violations of the Sherman Law. The Federal Trade
Commission Act was designed, doubtless, to enable the

---

[2] The strongest finding of the Commission, par. 11, Findings as to
the Facts, 47 F. T. C., at 387, states that these contracts have been
"of material assistance in permitting the respondent to hold for its
own use the screens of the theaters with which such contracts were
made and has deprived competitors of the respondent from showing
their advertising films in such theaters thereby limiting the outlets
for their films in a more or less limited field and in some instances
resulted in such competitors being forced to go out of the screen
advertising business because of inability to obtain outlets for their
screen advertising." Most contracts have the practical effect of
excluding those who are not parties, and failure to obtain business
is of course a cause of business failure. If all contracts are not to
be bad on such reasoning, it seems there must be more, particularly
in view of indications here not adverted to by the Commission in
its formal findings that what little business failure there has been
among competitors may to some extent have resulted from the in-
ferior quality of those competitors' films. See Trial Examiner's Re-
port Upon the Evidence, R. 44. In any event, such a finding does not
establish a Sherman Law violation. In Sherman Law proceedings,
we would have issues sharply defined in Sherman Law terms and
findings from relevant evidence specifically directed to those terms
made by the District Judge. Findings adverse to a claim of violation
of the Sherman Law would have the weight given by Rule 52 (a) of
the Federal Rules of Civil Procedure. Cf. *United States* v. *Oregon
Med. Soc.,* 343 U. S. 326, 332.

Commission to nip in the bud practices which, when full blown, would violate the Sherman or Clayton Act. But this record does not explain to us how these practices, if full blown, would violate one of those Acts. The Commission has been content to rest on its conclusion that respondent's exclusive contracts unreasonably restrain competition and tend to monopoly. If judicial review is to have a basis for functioning, the Commission must do more than pronounce a conclusion by way of fiat and without explication. This is not a tribunal for investigating an industry. Analysis of practices in the light of definable standards of illegality is for the Commission. It is for us to determine whether the Commission has correctly applied the proper standards and thus exhibited that familiarity with competitive problems which the Congress anticipated the Commission would achieve from its experience. Cf. *Federal Trade Commission* v. *Cement Institute,* 333 U. S. 683, 727.

No case is called to our attention which, because of factual similarity, would serve as a shorthand elucidation of the Commission's conclusion. The *Standard Oil* case, *supra,* relied on in the Commission's brief, does not serve this purpose. Although the *Standard Oil* case was brought under § 3 of the Clayton Act, I shall assume that it could have been brought under § 5 of the Federal Trade Commission Act, so that respondent cannot argue the inapplicability of the decision merely because the language of § 3 may be inapplicable. But taking that case simply as an expression of "policy" underlying § 5, it is not sufficient to support the holding in this case. In the *Standard Oil* case, we dealt with the largest seller of gasoline in its market; Standard had entered into exclusive supply contracts with 16% of the retail outlets in the area purchasing over $57,000,000 worth of gasoline. It may be that considerations undisclosed could be advanced to indicate that the percentage of the market

shut off here, calculated by a juggling of imponderables that we certainly would not confidently weigh without expert guidance, ought not to be considered significantly different from that in the *Standard Oil* case, or perhaps more important in the light of that decision, see 337 U. S., at 314, that the aggregate volume of business is of as great significance to the public as it was there. Even so, there are apparent differences whose effects we would need to have explained.

The obvious bargaining power of the seller *vis-à-vis* the retailer does not, so far as we are advised, have a parallel here. Nor are we apprised by proof or analysis to disregard the fact that here the advertising, unlike sales of gasoline by the retailer in the *Standard Oil* case, is not the central business of the theaters and apparently accounts for only a small part of the theaters' revenues.[3] In any event, in the *Standard Oil* case we recognized the discrepancy in bargaining power and pointed out that the retailers might still insist on exclusive contracts if they wanted. See 337 U. S., at 314. And although we are not told in this case whether the pressure for exclusive contracts comes mainly from the distributor or the theater, there are indications that theaters often insist on exclusive provisions. See Findings as to the Facts No. 12, *In re Motion Picture Advertising Service Co., supra,* at 388.

Further, the findings of the Commission indicate that there are some factual differences in the "exclusive" pro-

---

[3] It may well be that this factor will turn out to be of little significance. In an entirely different context, we recognized that such a factor need not be decisive in an attempt to assess the competitive effects, as among purchasers, of discriminatory pricing. See *Federal Trade Commission* v. *Morton Salt Co.,* 334 U. S. 37, 49–50. Since here, however, the factor probably bears more on the relative bargaining power of theaters and distributors than on competitive effects among the theaters, different considerations may operate.

visions here, for in this industry, as may not have been feasible in gasoline retailing, distributors of films often do have access to the theaters having nominally exclusive contracts with competing distributors. At times the exclusive provision may do little more than give the distributor a priority over other distributors in the use of screen space. Indeed, the degree of exclusion of competitors in some instances is represented simply by the inadequacy of a 15% commission paid the "excluded" competitor when he is permitted to show his films in theaters nominally exclusive. The Commission found the 15% unprofitable in local advertising, but it did not find how much of the affected competitors' total business, which may also have included manufacturer-dealer or cooperative advertising and national advertising, was in effect excluded because of the unprofitability of the commission in local advertising. In short, we are not told that the exclusive feature here should be considered the economic equivalent of that in the *Standard Oil* case.

Although the facts of this case do not meet the *Standard Oil* decision, even if that case is taken merely as an expression of antitrust policy engrafted on § 5, it is urged that the Commission should be allowed ample discretion in developing the law of unfair methods of competition to meet the exigencies of a particular situation without undue hampering by the Court. But if judicial review is to have any meaning, extension of principle to meet new situations must be based on some minimum demonstration to the courts that the Commission has relied on relevant criteria to conclude that the new application is in the public interest. In this case, apart from equivocal statements in the Trial Examiner's report on the evidence as to the interests affected by exclusion from this market, we have no specific indication of the need for enforcement in this area, cf. *Federal Trade Commission v. Keppel & Bro.*, 291 U. S. 304, 314, even if the Com-

mission had afforded reasons why the law of unfair methods of competition should strike down exclusive contracts such as those here involved. At the least, we should remand this case to the Commission for adequate explanation of the reasons why the public interest requires its intervention and this order.[4] Cf. *Federal Trade Commission* v. *Klesner,* 280 U. S. 19.

It is of great importance to bear in mind that the determination of the scope of the prohibition of "unfair methods of competition" has not been left to the administrative agency as part of its fact-finding authority but is a matter of law to be defined by the courts. See *Federal Trade Commission* v. *Gratz,* 253 U. S. 421, 427. The significance of such judicial review may be indicated by the dissimilar treatment of comparable standards entrusted to the enforcement of the Interstate Commerce Commission. In dealing with the provisions of the Interstate Commerce Act requiring reasonableness in rates and practices from carriers subject to the control of the Commerce Commission, we read the Act as making the application of standards of reasonableness a determination of fact by that Commission and not an issue of law for the courts. Unlike the Federal Trade Commission Act, the Interstate Commerce Act dealt with governmental regulation not only of a limited sector of the economy but of economic enterprises that had long been singled out for public control. The range within which the broadly stated concepts of reasonable-

---

[4] Since I take this view of the case, I need not attempt to determine whether the issues in this case have already been adjudicated in favor of the respondent. Without consideration of the record in the former proceedings, I cannot say whether the issues, raised as they apparently were in the pleadings before the Commission, were decided so as to preclude a second trial of those issues. Circumstances now undisclosed may justify the Commission's exercise of its flexible powers.

ness moved was confined as well as defined by experience, and application of the concepts was necessarily limited to easily comparable economic activity. On the other hand, the Federal Trade Commission Act gave an administrative agency authority over economic controls of a different sort that began with the Sherman Law—restrictions upon the whole domain of economic enterprise engaged in interstate commerce. The content of the prohibition of "unfair methods of competition," to be applied to widely diverse business practices, was not entrusted to the Commission for *ad hoc* determination within the interstices of individualized records but was left for ascertainment by this Court.

The vagueness of the Sherman Law was saved by imparting to it the gloss of history. See *Nash* v. *United States*, 229 U. S. 373. Difficulties with this inherent uncertainty in the Sherman Law led to the particularizations expressed in the Clayton Act. 38 Stat. 730. The creation of the Federal Trade Commission, 38 Stat. 717, made available a continuous administrative process by which fruition of Sherman Law violations could be aborted. But it is another thing to suggest that anything in business activity that may, if unchecked, offend the particularizations of the Clayton Act may now be reached by the Federal Trade Commission Act. The curb on the Commission's power, as expressed by the series of cases beginning with the *Gratz* case, *supra,* so as to leave to the courts rather than the Commission the final authority in determining what is an unfair method of competition, would be relaxed, and unbridled intervention into business practices encouraged.

I am not unaware that the policies directed at maintaining effective competition, as expressed in the Sherman Law, the Clayton Act, as amended by the Robinson-Patman Act, and the Federal Trade Commission Act, are difficult to formulate and not altogether harmonious.

Therefore, the interpretation of the Acts by the agency which is constantly engaged in construing them should carry considerable weight with courts even in the solution of the legal puzzles these statutes raise. But he is no friend of administrative law who thinks that the Commission should be left at large. In any event, whatever problems would be raised by withholding judicial review from determinations of the Commission are for Congress to face, at least in the first instance. (See my views expressed in *Stark* v. *Wickard,* 321 U. S. 288, 311.) Until Congress chooses to do so, we cannot shirk our duty by leaving determinations of law to the discretion of the Federal Trade Commission. Not only must we abstain from approving a mere say-so of the Commission and thus fail to discharge the task implied by judicial review. It is also incumbent upon us to seek to rationalize the four statutes directed toward a common end and make of them, to the extent that what Congress has written permits, a harmonious body of law. This opinion is an attempt, at least by way of adumbration, to carry out this aim.

I would have the Court of Appeals remand this case to the Commission.