[EDITOR'S NOTE: This case is unpublished as indicated by the issuing court.]
MEMORANDUM OF DECISION ON CHEMICAL LEAMAN'S MOTION TO STRIKE
The defendant Chemical Leaman has brought a motion to strike against the plaintiffs' claims for (1) loss of filial consortium and the plaintiff parents claim for medical expenses for treatment of their minor child, (2) counts III, X, and XII (negligent infliction of emotional distress, (3) Count IV (strict liability), (4) count V nuisance, (5) Count VI (CUPTA claim), (6) Counts IX, X, XI, XII failure to state cause of action because they are brought against corporate officials or agents in their individual capacity.
This suit arises out of an explosion that occurred at the defendant's facility. The allegation is made that as a result of the explosion certain toxic materials and contaminants were spread on to an adjacent property known as Rose Orchards. The day after the explosion the plaintiff mother had occasion to visit the orchard and allegedly come in contact with these contaminants. At the time she was pregnant. The claim is made that as a result of the plaintiff mother's exposure to these toxic materials her child suffered severe injury and was born with a variety of medical problems. The suit alleges various theories of relief and the motion to strike is aimed at several of them. The allegations of the third revised complaint will be discussed further as they become relevant.
The rule on a motion to strike is that the complaint must be given that reading which is most favorable to the plaintiff, Amodiov. Cummingham, 182 Conn. 80 (1982) but such a motion cannot be resisted by conclusory assertions. A plaintiff must plead facts.
 I.
The defendant Chemical Leaman construes certain paragraphs of the First Count of the plaintiff's complaint as alleging parental claims of interference with their relationship with their child as a result of injuries purportedly suffered by the child due to the defendant's negligence. The defendant argues that Connecticut Appellate Courts have held that loss of consortium claims do not include filial consortium claims between a parent and child or between a child and his siblings. My understanding is that the siblings are not plaintiffs in this litigation and as far as claims of loss of filial consortium are concerned no Appellate Court has held no such claim may be made. Hobson v. St. Mary's Hospital, CT Page 4109-RR176 Conn. 485 (1979) held that an action for loss of spousal consortium may be made there was no claim for loss of filial consortium in the case. The court in Maloney v. Lesniak, 17 Conn. App. 130, 141
(1988) in dicta said "the right to consortium is said to arise out of the civil contract of marriage and as such does not extend to the parent child relationship." However, in footnote 7 on page 141 the court made clear it was not deciding the issue and the issue had not been decided by the Appellate Courts. There are Superior Court cases taking opposing views on this question. I will deny the motion to strike this claim by resting on a decision I wrote inJoseph Scalise, et al. v. Bristol Hospital, et al.,14 Conn. L. Rptr. 534 (1995) where I discussed the matter.
2.
I agree with the defendant that the claims for medical expenses are at least ambiguous in that they certainly can be read to ask for medical expenses on behalf of the child and for recovery of medical expenses made by the parents for the child. Pursuant to § 52-204 both the child and the parents cannot make a claim to recover such medical expenses. I believe the plaintiff recognizes this but maintains that the jury instructions would preclude the possibility of any double recovery. The defendant, however, has a right to move to strike these pleadings based on their ambiguity on this issue. The plaintiffs merely has to plead over as they have a right to do.
The defendant seeks to strike the third, tenth, and twelfth counts. It claims that although the plaintiffs have labeled these counts as sounding in negligent infliction of emotional distress "they have, in reality, alleged a claim for bystander emotional distress, " (page 7 of defendant's brief). The characterization made by the defendant is that in a negligent infliction of emotional distress claim an injury is directly caused to the plaintiff whereas in a bystander recovery claim the allegation is that a defendant's negligence has injured a third party. The distinction becomes somewhat confused when the injury is to the child during the birthing process and the mother makes the claim, cf Joseph Scalise, et al. v. Bristol Hospital, et al., at p. 537.
I am not sure that cases recognizing an action for negligent infliction of emotional distress in these birthing process injury cases would extend the reach of that doctrine to provide a recovery for the mother for observed injuries to the child apparent after the birthing process. I will regard this then as an action for CT Page 4109-SS recovery for bystander emotional distress. Several cases have recognized that doctrine. I did so in Corchesne v. Dickou Bus Co.,11 Conn. L. Rptr. 463 (1994). Since there is a virtue in consistency and I at least tried to analyzed the competing considerations in Corchesne, I still conclude there should be a cause of action for bystander emotional distress in our state.
I have serious doubt whether an action for what in effect appears to be an action for bystander emotional distress should be allowed on the facts of this case. The California courts have created this doctrine and I believe have intelligently limited it, see Thing v. La Chusa, 771 P.2d 814, 829-30 (1989, Cal.). I am not sure the allegations here meet the requirements of Thing v.La Chusa supra. However, neither side really argued this question or addressed it in their briefs so I am reluctant to grant the motion without giving counsel the chance for further argument. If the defendant wishes to press this motion on these three counts it should so inform the plaintiff and both sides can contact my clerk to set a date for further argument.
4.
In the Fourth Count the plaintiff makes a claim for strict liability in tort for engaging in abnormally dangerous activities by virtue of the storage and use of hazardous materials on its property.
A claim such as this raises very technical issues as to whether it should be tested by a motion to strike or by way of summary judgment, Connecticut Water Co. v. Town of Thomaston, etal., 16 Conn. L. Rptr. 213, 215-18 (1996).
In this regard the facts alleged in a complaint are to be construed in a manner that is most favorable to the plaintiff when the complaint is attacked by a motion to strike, Amodio v.Cunningham, 182 Conn. 80 (1980). On the other hand claims must be supported by factual allegations otherwise a motion to strike is appropriate. Pepper v. The American Way Homes, Inc., 6 Conn. L. Trib. #26, p. 17 (1980).
Adopting the reasoning of Connecticut Water Co. v. Town ofThomaston, supra. I have to regard the strict liability, claim asserted here as merely conclusory. For the reasons stated in that opinion I do not believe the mere storage of hazardous or toxic material as such permits a strict liability claim unless perhaps CT Page 4109-TT there is some factual allegation that due to the corrosive properties of the substance or its gaseous nature it cannot be stored without leaking or escaping into the environment.
If the claim is that the use and/or disposal of the material is the basis of the claim I do not believe a strict liability claim can be based on what in fact is a leak or escape of hazardous material due to negligent activity. Arlington Forest Associates v.Exxon Corporation, 774 F. Sup. 387, 392 (E.D. Va, 1991).
In paragraph 15 of the Fourth Count it is stated the materials the defendant handled are intrinsically dangerous to people and property "in the event of an accident, spill, or release like that which occurred on September 8, 1991." Paragraph 16 states as a result of the defendant's choice to engage and do business in an intrinsically and abnormally dangerous activity on the date mentioned there was a release of toxic material which caused the plaintiff's damage.
All of this is conclusory and doesn't supply the essential factual allegations to make out a strict liability claim. In other words the mere fact that a business or person stores toxic substances or even uses or disposes of such material does not establish a strict liability claim even if on occasion such material is spilled or released. The nature of the material must be such that its storage, use, or disposal in the ordinary course despite any safety standards that are adopted will and does result in such release or spillage. Even given these pleadings there most favorable reading I cannot conclude that sufficient factual allegations are set forth to support this theory. In fact the "like that which occurred on September 8, 1991" language makes the claim of strict liability somewhat legally suspect since the first three counts are based on variations of a negligence claim concerning the release of toxic material which occurred on the date in question.
I will grant the motion to strike as to the Fourth Count.
5.
The defendant has also filed a motion directed toward the Fifth Count and alleges in the 13th paragraph a "private nuisance." The plaintiff's now argues that in any event they have set forth sufficient factual allegations to support a "public nuisance" theory of liability. Factual allegations of the first count are CT Page 4109-UU incorporated into this count and those allegations state that an explosion occurred at the defendant's facility releasing pollutants into the air which "came to rest in part the entire property and orchard farm . . . owned by David S. Rose and maintained and operated as Rose Orchards", par. 22 of First Count and 16 of Fifth Count. The plaintiff later entered the Orchard and alleges she was subjected to contamination which caused her injury. Paragraph 26 of the First Count and thus paragraph 20 of the Fifth Count says that soon after her involuntary exposure to the contaminants the plaintiff mother "left the Rose Orchards Farm property and the surrounding area, to return home." That is the only place in the Fifth Count where the words "surrounding area" are used. As noted in paragraph 16 of the Fifth Count (22 of First Count) the plaintiffs claim the pollutants fell "in part" on the Rose Orchard. Where the other "parts" may have come to rest is not alleged — they could have come to rest on non-Rose Orchard and non-defendant property, they could have come to rest on the defendant's own property. Dahlstrom v. Roosevelt Mills, Inc., 27 Conn. Sup. 355,357 (1967) referred to by both parties states:
 Nuisances are public where they violate public rights, and produce a common injury, and where they constitute an obstruction to public rights that is the rights by citizens as part of the public" (citations omitted).
In Higgins v. Connecticut Light Power Co., 129 Conn. 600, 611
(1943) the court said:
 . . . if the annoyance is one that is common to the public generally then it is a public nuisance. . . . The test is not the number of persons annoyed, but the possibility of annoyance to the public by the invasion of its rights. A public nuisance is one that injures the citizens generally who may be so circumstanced as to come within its influence. (citations omitted).
The Restatement 2d Torts at § 821 comment (g) gives some factual examples that make the notion of a "public nuisance" somewhat clearer. Speaking of that interference with a public right that creates a public nuisance the Restatement says at page 92-93 citing factual examples.
 Thus the pollution of a stream that merely deprives fifty or a hundred lower riparian owners of the use of the water for purposes connected with their land does CT Page 4109-VV not for that reason alone become a public nuisance. If, however, the pollution prevents the use of a public bathing beach or kills the fish in a navigable stream and so deprives all members of the community of the right to fish, it becomes a public nuisance. . . .
 It is not, however, necessary that the entire community be affected by a public nuisance, so long as the nuisance will interfere with those who come in contact with it in the exercise of a public right or it otherwise affects the interests of the community at large. The obstruction of a public highway is a public nuisance, although no one is travelling upon the highway or wishes to travel on it at the time. . . .
 In any case in which a private nuisance affects a large number of persons in their use and enjoyment of land it will normally be accompanied by some interference with the rights of the public as well. Thus the spread of smoke, dust or fumes over a considerable area filled with private residences may interfere also with the use of the public streets or affect the health of so many persons as to involved the interests of the public at large.
Based on the factual allegations of this Fifth Count all I can deduce with certainty that "in part" contaminants fell on to the Rose Orchard property. Also the plaintiff mother came to be on that particular property where she came into contact with contaminants. This seems to be the exact situation faced by the court in Dahlstrom v. Roosevelt Mills Inc., supra where the court sustained a demurrer on a complaint of public nuisance. The plaintiff there said he entered a store and was injured claiming the condition of a soft drink vending machine on the premises constituted a public nuisance.
In granting the demurrer the court said at27 Conn. Sup. at p. 357:
 As a patron, the plaintiff was an invitee while in the defendant's establishment. While members of the general public were unquestionably welcome to enter the store, and even solicited to do so, nevertheless they were not entitled to do so by virtue of any public right enjoyed by citizens as part of the public. The public was CT Page 4109-WW invited to enter, but there was no public right to do so, and the defendant's establishment was not a public place where the public had a right to be. The plaintiff was not in the exercise of any public right while on the defendant's premises, and he cannot base his right to recover upon the existence of a public nuisance.
It might be that if in fact contaminants are spread over a! large area including public streets giving access to private residences or businesses a public nuisance claim can be made by an individual under circumstances where that person suffers injury while going to those premises as the Restatement perhaps suggests but no such allegations are made here.
The motion to strike the Fifth Count is, however, granted for the reasons stated.
Finally for possible future reference, although I will grant the motion to strike, I will not grant it on the additional ground that is suggested in the defendant's brief. At page 11 it, states or implies a public nuisance claim cannot be made because the plaintiffs "claim to have received personal and monetary `injuries' resulting from the actions of defendant Chemical Leamon." Under the Restatement (§ 821 C) to recover in an individual action for a public nuisance one must have suffered a harm of a kind or type different from that suffered by other members of the public exercising the right common to the general public that was the subject of interference. As the Restatement indicates in comments (d) and (h) where a public nuisance causes personal injury to the plaintiff or pecuniary loss that is certainly a harm normally different in kind from that suffered by the general public.
6.
In the Sixth Count the plaintiff alleges a violation of the Connecticut Unfair Trade Practices Act, § 42-110b et seq. The following factual allegations are made in this count: the defendant Chemical Leaman at times relevant to this complaint was engaged in trade or commerce in our state the defendant failed to maintain properly placarded tankers when storing loads at its Branford facility and failed to maintain and control substances stored at its facility so as not to damage neighboring persons or property and their invitees. The latter two factual allegations support the plaintiffs' claim of a deceptive or unfair trade practice under the act. These factual allegations are used to also support a claim CT Page 4109-XX that the actions of the defendant in this regard were "immoral, unethical, oppressive or unscrupulous" and thus violative of our Unfair Trade Practices Act. These acts are then alleged to have caused injury to the plaintiff mother and as a result to her unborn child because it is further alleged the plaintiff mother entered on property adjacent to the defendant's facility the day after there was an explosion at the facility. This explosion resulted in the plaintiff being exposed to contaminants when she entered the neighboring property. As a result of her exposure to contact with and ingestion of the contaminants the plaintiff mother suffered from harmful physical and medical reactions and the claim is made that the condition and the health of her unborn child was also affected all of which led to severe injury and damages.
The just recited facts, if proven, would entitle the plaintiff's to recovery under one or more theories of liability. The question is do they provide the basis for a CUTPA claim. The defendant says they do not and has filed a motion to strike this claim.
Section 42-110b states that the legislative intent of CUTPA was that no person should engage in unfair methods of competition and unfair and deceptive acts or practices in the conduct of any trade or commerce. Subsection (b) indicates that in interpreting our act the legislature intended that our courts be guided by interpretations given by the Federal Trade Commission and the federal courts to Section 5(a)(1) of the Federal Trade Commission Act, 15 U.S.C. § 45 (a)(1).
The Federal Trade Commission Act when originally enacted in 1914 was designed to supplement and bolster the Sherman and Clayton Act. It forbade only "unfair methods of competition in commerce." In 1938 the Act was amended to outlaw also "unfair acts or deceptive acts or practices in commerce." This amendment as noted in Trade Commission v. APW Paper Co., 328 U.S. 193, 199, ftn. 4, was designed to make the consumer who may be injured by an unfair trade practice of equal concern with a merchant or business person engaged in competition with an alleged wrongdoer.
The plaintiff mother in this case of course is not a "competitor" of the defendant so that she or the other plaintiffs in this case can only proceed under CUTPA if she or they can be categorized as "consumers". Larsen Chelsy Realty Co. v. Larsen,232 Conn. 480, 495-96 (1995) limited the reach of dicta in Jacksonv. RG Whipple Inc., 225 Conn. 705, 725-26 (1993) insofar as it CT Page 4109-YY implied that the act was limited to consumer relationships. As theLarsen case noted a competitor or other business person can maintain a CUTPA claim without showing a consumer injury Id. p. 496. Keeping that limitation in mind, however, the Jackson dicta is still instructive in trying to arrive at a definition of what a "consumer" is in light of the purposes of the federal act and our act. The court in Jackson at 225 Conn. pages 725-27.
 . . . it strains credulity to conclude that CUTPA is so formless as to provide redress to any person, for any actionable harm caused by any person in the conduct of any `trade' or `commerce' . . . a claimant under CUTPA must possess at least some type of consumer relationship with the party who allegedly caused harm to him or her.
In other words the defendant company stored and managed these toxic materials as part of its business, the business qua business is involved in trade or commerce. But the injuries allegedly suffered by the plaintiffs did not result from the activities of the defendant as a result of its "conduct" in trade or commerce with the plaintiff as consumers. In other words our act, modeled as it is on the federal act gives protection to wronged competitors and consumers but not to the world at large or any individual who might be injured by the activities of a business entity no matter what relationship the individual had with that business, even no relationship at all. The federal law and ours were aimed at regulating and sanitizing commerce and practices in commercial markets.
Admittedly the "unfair methods of competition referred to in Section 5(a)(1) of the federal act have been described as flexible", and are not confined to those that were illegal at common law or condemned in the Sherman Act but still they are "to be defined with particularity by the myriad of cases from the field of business", FTC v. Motion Picture Advertising Service Co.,344 U.S. 392, 394 (1953) (emphasis added). The plaintiff mother here alleged to have been contaminated when she entered a piece of property adjacent to the defendant's facility a day after an explosion at that facility. She had no consumer relationship let alone a business relationship with the defendant at the time of her injury, she did not suffer injury as a result of a business or consumer relationship with the defendant and her injuries or that of any other plaintiff did not arise out of any such relationship. Therefore no action on this state of alleged facts may be brought under CUTPA against the defendant cf Watson et al. v. NortheastCT Page 4109-ZZUtilities, 11 Conn. L. Rptr. 200 (1994) injuries allegedly caused by electromagnetic radiation from an electrical substation are not injuries received in plaintiff's capacity as a consumer and this are not covered by CUTPA, also see Edelwich v. 33 SummerAssociates, 9 CSCR 620 (1994).
I will grant the motion to strike only on the above stated ground, however I will not address the claim raised by the defendant that CUTPA does not apply to personal injuries. Count Six is stricken.
7.
The defendants St. Jean and Latham are employees of the defendant corporation and have been sued by the plaintiffs for negligence and negligent infliction of emotional distress, Counts Nine, Ten, Eleven and Twelve.
These individual defendants have now moved to strike the counts against them based on Scribner v. O'Brien, 169 Conn. 389
(1975). They also cite Amortek Indus. Inc. v. Freedman,790 F. Sup. 383 (D. Conn. 1992) and Lailhengue v. Mobil Oil Corp.,775 F. Sup. 908 (E.D. La, 1991).
In Scribner at 169 Conn. page 404 the court said:
 "It is also true that an officer of a corporation does not incur personal liability for its torts merely because of his (sic) official position. Where, however, an agent or officer commits or participates in the commission of a tort whether or not he acts on behalf of his principal or corporation, he (sic) is liable to third persons injured thereby."
Cf First National Bank Trust Co. v. Manning, 116 Conn. 335, 340
(1933), Sample v. Morgenstern, 97 Conn. 402, 404 (1922), Bennett v.Ives, 30 Conn. 329, 334 (1862). Fletcher Cyclopedia Corporations, Vol. 3A § 1135, § 1137 also takes the view that personal participation in the tort by a corporate officer is essential if he or she is to be held liable. The defendants have also citedAmortek Industries Inc. v. Freedman, 790 F. Sup. 383, 394
(D. Conn. 1992) which adopts the view that individual liability of corporate officer does not depend on his or her status as such "but depends on the specific activities of a party, including the level of involvement in day to day business operations and participation CT Page 4109-AAA in decisions regarding disposal of hazardous waste."
From this general reference to the law which is, as the defendants note, widely accepted the defendants make a further argument which is not so "black letter". The defendants at page 17 of their brief say "plaintiffs' assertions of alleged omission/failures by the Chemical Leaman employees fails to validate the Common Law claims — corporate employees cannot be held liable for mere omissions or `nonfeasance.'" In other words the defendants argue the plaintiffs have failed to plead that the individual defendants actively participated in the tortious activity. They allege nothing more than a failure to act, Lailhengue v. MobilOil Corp., 775 F. Sup. 908, 910 (E.D. La, 1991) (this case cites Louisiana Law).
The distinctions between malfeasance, nonfeasance and misfeasance, which is apparently a concept between mal and nonfeasance but heading towards malfeasance are more easily, put on paper than explained. I agree with the opinion of an Ohio case,Schaefer v. D J Produce Inc., 403 N.E.2d 1015, 1019-20 (1978). There the court said:
 Early Ohio cases drew a distinction between an agent's acts of misfeasance or positive wrongs, and an agent's nonfeasance or omissions of duty. The agent was held personally liable to third parties for his positive wrongs and misfeasances but, in general, the agent was not held liable to third persons for his nonfeasance and omissions of duty therein. See 2 Ohio Jurisprudence 2d 208, Agency, Section 144 and cases cited therein. Later Ohio decisions, particularly Richards v. Stratton (1925), 112 Ohio St. 476, 147 N.E. 645, and Employers' Fire Ins. Co. v. U.P. Service, Inc. (1950), 89 Ohio App. 447, 99 N.E.2d 794, indicate a departure from reliance on distinctions between misfeasance and nonfeasance as the measure of an agent's liability. These cases are in line with the modern trend of authority summarized in 2 Ohio Jurisprudence 2d 208, Agency, Section 144, as follows:
 The modern tendency of the courts is to repudiate, in cases where the agent has actually undertaken the work, any distinction as to the liability of agent to third persons in tort, based on the fact that the cause of the injury may be an omission to perform some act — a CT Page 4109-BBB nonfeasance — rather than a positive misfeasance, and to hold the agent liable equally for his nonfeasance or negligent omissions of duty (in the sense of omitting to do some part of the work he has actually undertaken to do) as for his positive misfeasances. . . .
 As observed in Employers' Fire Ins. Co., supra, at 452, 99 N.E.2d at 797, the difficulty with using the terms "misfeasance" and "nonfeasance" as a criterion of the agent's liability "is that the terms themselves require definition to determine when nonfeasance ceases and misfeasance or malfeasance begins." This method of determining an agent's liability has been severely criticized.
Also see Restatement of Torts 2d § 324(a) page 142, Restatement of Agency 2d § 354, p. 142.
The defendants raise a specter — "If mere omissions could be the basis for corporate employee liability, there would be no logical limitation on the number of corporate employees who might be sued" (p. 16 of brief). of course there would be a limitation on what corporate officers could be sued — it would depend on their responsibility for and participation in the acts or failures to act comprising the corporate activity and causing injury. In other words the limitation would be based on the concept of duty not scholastic disputes about whether in a particular case we had malfeasance, misfeasance, or nonfeasance.
 After all . . . it seems that the true basis of liability should be the violation by the officer or servant of some duty owed to the third person by reasons whereof injury results to such third person. Certainly the managing officer of a corporation would not be liable to a third person for any injury resulting from a neglect of duty unless that duty was one he (sic) owed to such third person, Darling Co. v. Fry, 24 S.W.2d 722, 724 (Mo. 1930).
In fact if Scribner v. O'Brien Inc., supra is closely examined and the basis for the suit is looked at it could be categorized as a case of nonfeasance. There a claim was made against individual corporate employees for failure to put in a drainage system169 Conn. at p. 396 and the trial court concluded that the resulting water problem was caused by defendant's excavation of the property CT Page 4109-CCC and failure to provide for drainage — that sounds like nonfeasance, or at least misfeasance. In any event the Scribner court made the question of individual liability turn on the question of the actual participation of the corporate officers in the construction project. Id. pp. 403-04.
As to both defendants the plaintiffs allege that they had! responsibility over certain equipment, substances, and personnel who worked with these substances and equipment and their failure to take certain steps regarding the supervisory role resulted in the discharge of contaminants which caused injury to the plaintiffs.
That is enough to get by a motion to strike as to the counts against these individual defendants — whether they could be sued in their individual capacities was the only ground raised against counts Nine and Eleven and I will not grant the motion to strike on this particular ground as to Counts Nine, Ten, Eleven and Twelve.
The motion to strike is granted as to the following matters: Motion to strike as it relates to certain medical expenses; Count Four (strict liability), Count Five (nuisance), Count Six (CUTPA claim).