OMEGA ENVIRONMENTAL, INC., a Delaware corporation; ATS Omega, a Texas corporation; Kelley Omega, a Washington corporation; John J. Reynolds, individually; Patrick J. Reynolds, individually; Fedorico Haller, individually; Francisco Calleja, individually; Fernando Calleja, individually; William H. Kelley, individually; Michael J. Reynolds, individually, Plaintiffs–Appellees,

v.

GILBARCO, INC., a Delaware corporation, Defendant–Appellant.

OMEGA ENVIRONMENTAL, INC., a Delaware corporation; ATS Omega, a Texas corporation; Kelley Omega, a Washington corporation; Plaintiffs–Appellants,

and

John J. Reynolds, individually; Patrick J. Reynolds, individually; Fedorico Haller, individually; Francisco Calleja, individually; Fernando Calleja, individually, William H. Kelley, individually; Michael J. Reynolds, individually, Plaintiffs,

v.

GILBARCO, INC., a Delaware corporation; Rochester Petroleum Equipment Company, a Minnesota corporation, Defendants–Appellees.

Nos. 96–35153, 96–35172 and 96–35594.

United States Court of Appeals,
Ninth Circuit.

Argued and Submitted June 4, 1997.

Decided Oct. 29, 1997.

---

David J. Burman, Perkins Coie, Seattle, Washington, for plaintiffs-appellees-cross-appellants.

Timothy J. Waters, William H. Barrett, Amy E. Hancock, Robert E. Kohn, McDermott, Will & Emery, Washington, DC, Stephen A. Kroft, McDermott, Will & Emery, Los Angeles, California, Fredric C. Tausend, Hugh F. Bangasser, Ramona M. Emerson, Preston Gates & Ellis, Seattle, Washington, for defendant-appellant-cross-appellee.

J. Thomas Richardson, Cairncross & Hempelmann, Seattle, Washington, for defendant-cross-appellee.

Before: WRIGHT, PREGERSON and THOMPSON, Circuit Judges.

Opinion by Judge WRIGHT; Dissent by Judge PREGERSON.

EUGENE A. WRIGHT, Circuit Judge.

In this complex antitrust case we must decide, among other issues, whether the district court erred in submitting to the jury the plaintiffs' Clayton Act § 3 exclusive dealing and other state law claims.

## I

### Background

Manufacturers of petroleum dispensing equipment [1] sell their products, both directly and through authorized distributors, to the owners of retail gasoline outlets, including major oil companies, independent business persons ("jobbers"), national and regional convenience store chains, and independent regional oil companies. Five manufacturers-Gilbarco, Dresser Wayne, Tokheim, Schlumberger, and Bennett-currently compete for these sales in the United States.

Larger customers, such as the major oil companies and national convenience store chains, generally purchase their dispensers directly from the manufacturers through annually negotiated contracts. Major oil companies often negotiate prices for their affiliated jobbers, but the jobbers are not required to purchase their dispensers from their major oil company's principal supplier. Smaller customers typically purchase their dispensers from the approximately 500 authorized dispenser distributors.[2] Although these distributors can and do sell the dispensing equipment of each manufacturer, each is the authorized dispenser distributor of only one manufacturer.

Dispenser manufacturers compete for sales at major oil companies and industry trade shows and during the annual negotiations of their contracts with the major oil companies. Customers purchasing either directly or through authorized distributors typically seek competitive bids before making their purchases. It is undisputed that competition among distributors is intense.

Defendant Gilbarco, Inc. is the market leader in product innovation and improvement,[3] and its products are widely recognized as among the best in the industry. It also leads in sales, capturing roughly 55% of the domestic market for dispensers in 1995. Approximately one-third of its dispenser sales are made directly to end users while the remaining two-thirds are through authorized distributors. These percentages vary greatly among dispenser manufacturers. Dresser Wayne for example, the second-leading dispenser manufacturer, sells over 70% of its dispensers directly to the major oil companies and jobbers.

Gilbarco has some 120 authorized distributors operating under its standard form "Domestic Distributor Agreement." The agreements have an initial term of one year and are thereafter expressly terminable by either party, without cause and without penalty, on 60 days notice.

Plaintiff Omega Environmental, Inc. was organized in 1991. It introduced no manufacturing capacity to the industry, but instead proposed to develop a national service and distribution network by purchasing existing concerns. This network would provide "one-stop shopping" to consumers of petroleum dispensers and related equipment. Each Omega distributor would offer multiple product lines, and the network would engage in consolidated purchasing from manufacturers. To that end, Omega targeted for acquisition a number of existing distributors and servicers, including two authorized Gilbarco distributors, plaintiffs ATS–Omega ("ATS") and Kelley–Omega ("Kelley").

---

**1.** "Petroleum dispensing equipment" includes dozens of products, from the canopies that protect motorists from the rain, to the vapor recovery systems that capture escaping fumes. Only the retail dispensers are here at issue.

**2.** Another 500–600 companies sell petroleum dispensing equipment other than dispensers. Some of these are appointed "authorized service contractors" ("ASCs"). They provide war-

ranty work and install and repair dispensing equipment, and occasionally become authorized distributors. Plaintiff ATS–Kelley was an ASC before becoming an authorized Gilbarco distributor.

**3.** Gilbarco was the first manufacturer to introduce "multi-product dispensers" which allow customers to obtain different grades of fuel from the same dispenser.

In December 1993, in response to Omega's introduction of a distribution strategy at odds with its own, Gilbarco had internal meetings and met separately with its Distributor Advisory Council and Omega representatives. In February 1994, Gilbarco notified each of its authorized distributors that it intended to "continue to do business with service station equipment distributors who [s]ell only the Gilbarco line of retail dispensers." Accordingly, it notified Kelley, acquired by Omega in 1993, that its distributorship agreement would not be renewed. In April 1994, one month after Omega purchased ATS, Gilbarco gave ATS 60 days notice that it was terminating their agreement. This suit followed.

Plaintiffs alleged three distinct antitrust claims under the Sherman and Clayton Acts and their state law counterparts. They claimed that Gilbarco and several distributors, including the Distributor Advisory Council chair, defendant Rochester Petroleum Equipment, Inc., had conspired to maintain resale prices for petroleum dispensing equipment and to allocate territories and customers in violation of § 1 of the Sherman Act and Wash. Rev. Code § 19.86.030. They also alleged that the defendants had conspired to monopolize, and attempted to monopolize, the market for the sale of petroleum dispensing equipment in violation of § 2 of the Sherman Act and Wash. Rev. Code § 19.86.040. In their final antitrust claim, plaintiffs contended that Gilbarco's policy violated § 3 of the Clayton Act and Wash. Rev. Code § 19.86.050. In addition to their antitrust claims, plaintiffs asserted that Gilbarco engaged in unfair competition in violation of Wash. Rev. Code § 19.86.020, breached contractual obligations, made negligent misrepresentations, and tortiously interfered with business relations.

The district court granted summary judgment to Gilbarco on the Sherman Act claims and their state-law counterparts. After the plaintiffs' case-in-chief, the court dismissed two contract claims and ATS's and Kelley's tortious interference claims on Gilbarco's motion for judgment as a matter of law. The jury returned a verdict against Gilbarco on each claim submitted for its decision: exclusive dealing, unfair competition, breach of contract, negligent misrepresentation and tortious interference. The district court determined that the damage awards on these claims were duplicative, and gave judgment against Gilbarco on the single claim which represented the largest award to each plaintiff. Aggregated, these awards totalled $9,000,000, which the court trebled. It denied plaintiffs' request for injunctive relief. Gilbarco renewed its motion for judgment as a matter of law on each claim. The district court denied the motion in a one-sentence minute order. It awarded to the plaintiffs attorney's fees and costs exceeding $1,000,-000.

Gilbarco appeals from the denial of its motion for judgment as a matter of law on each claim, from the $27,000,000 judgment, and from the fee award. Omega cross appeals the summary judgment on its Sherman Act § 1 claim, the denial of injunctive relief, and the reduction of the damage award.

## II

### Standards of Review

We review *de novo* the denial of a renewed motion for judgment as a matter of law, using the same standard as the district court. Judgment as a matter of law is appropriate when the evidence, construed in the light most favorable to the nonmoving party, permits only one reasonable conclusion, which is contrary to the jury's verdict. *Vollrath Co. v. Sammi Corp.*, 9 F.3d 1455, 1460 (9th Cir.1993). Applying this standard, we are mindful of the Supreme Court's admonition that, in antitrust cases, "a reasonable jury is presumed to know and understand the law, the facts of the case, and the realities of the market." *Brooke Group Ltd. v. Brown & Williamson Tobacco Corp.*, 509 U.S. 209, 243, 113 S.Ct. 2578, 2598, 125 L.Ed.2d 168 (1993).

We also review *de novo* the district court's interpretation of state law, *Huey v. Honeywell, Inc.*, 82 F.3d 327, 329 (9th Cir. 1996), and the application of that law to undisputed facts, *Boone v. United States*, 944 F.2d 1489, 1492 (9th Cir.1991).

## III

## Analysis

### A. Exclusive Dealing

■ Section 3 of the Clayton Act provides: It shall be unlawful for any person ... to lease or make a sale or contract for sale of goods ... on the condition, agreement, or understanding that the lessee or purchaser thereof shall not use or deal in the goods ... of a competitor ... of the lessor or seller, where the effect ... may be to substantially lessen competition or tend to create a monopoly.

15 U.S.C. § 14.

■ The main antitrust objection to exclusive dealing is its tendency to "foreclose" existing competitors or new entrants[4] from competition in the covered portion of the relevant market during the term of the agreement. *Roland Machinery Co. v. Dresser Industries, Inc.*, 749 F.2d 380, 393 (7th Cir.1984)(Posner, J.). There are, however, well-recognized economic benefits to exclusive dealing arrangements, including the enhancement of interbrand competition. *See e.g. id.* at 395; *Joyce Beverages of N.Y. Inc. v. Royal Crown Cola Co.*, 555 F.Supp. 271, 277–78 (S.D.N.Y.1983). And, as then-Judge Breyer noted, in the analogous context of requirements contracts, "virtually *every* contract to buy 'forecloses' or 'excludes' alternative sellers from *some* portion of the market, namely the portion consisting of what was bought." *Barry Wright Corp. v. ITT Grinnell Corp.*, 724 F.2d 227, 236 (1st Cir.1983). We thus analyze challenges to exclusive dealing arrangements under the antitrust rule of reason. *Twin City Sportservice, Inc. v. Charles O. Finley & Co., Inc.*, 676 F.2d 1291, 1302 (9th Cir.1982); see *Tampa Electric Co. v. Nashville Coal Co.*, 365 U.S. 320, 327, 81 S.Ct. 623, 627–28, 5 L.Ed.2d 580 (1961); *Roland*, 749 F.2d at 393. Only those arrangements whose "probable" effect is to "foreclose competition in a substantial share of the line of commerce affected" violate Section 3. *Tampa Elec.*, 365 U.S. at 327, 81 S.Ct. at 627–28; *Twin City*, 676 F.2d at 1304 n. 9; *see also Jefferson Parish Hospital District No. 2 v. Hyde*, 466 U.S. 2, 45, 104 S.Ct. 1551,

1576, 80 L.Ed.2d 2 (1984)(O'Connor, J. concurring)("Exclusive dealing is an unreasonable restraint on trade only when a significant fraction of buyers or sellers are frozen out of a market by the exclusive deal.").

The parties agree that the plaintiffs have correctly defined the relevant market as the "the sale of retail gasoline dispensers from manufacturers in the United States." Plaintiffs contend, however, that Gilbarco's policy forecloses from competition 24% of the available *distributors*. The focus on this subset of the relevant market is misplaced:

> The foreclosure effect, if any, depends on the market share involved. The relevant market for this purpose includes the full range of selling opportunities reasonably open to rivals, namely, all the product and geographic sales they may readily compete for, using easily convertible plants and marketing organizations.

2A Phillip E. Areeda *et al., Antitrust Law* ¶ 570b1 at 278 (1995); *see also Tampa Elec.*, 365 U.S. at 330–33, 81 S.Ct. at 629–31.

The foreclosed market, in purely quantitative terms, is more accurately described as the percentage of Gilbarco's total market share sold through its authorized distributors. Seventy percent of Gilbarco's total dispenser sales are through distributors, and it captured 55% of the total market in 1995. Construing this evidence in the plaintiffs' favor, the jury could reasonably have concluded that Gilbarco's policy foreclosed roughly 38% of the relevant market for sales. Although 38% appears significant, *see e.g. Twin City*, 676 F.2d at 1304 (holding that 24% foreclosure for an unreasonable length of time is substantial), we conclude that it "considerably overstates the size of the foreclosure and its likely anticompetitive effect for several reasons." *Barry Wright*, 724 F.2d at 237.

■ First, exclusive dealing arrangements imposed on distributors rather than end-users are generally less cause for anticompetitive concern. *Ryko Mfg. Co. v. Eden Services*, 823 F.2d 1215, 1235 (8th Cir.

---

4. Plaintiffs cast their argument in terms of "entry barriers," while Gilbarco discusses "foreclosure from the relevant market." Aside from the status of the allegedly affected competitors, i.e., incumbent firms or new entrants, we perceive little meaningful difference.

1987)("Where the exclusive dealing restraint operates at the distributor level, rather than at the consumer level, we require a higher standard of proof of 'substantial foreclosure.' "). If competitors can reach the ultimate consumers of the product by employing existing or potential alternative channels of distribution, it is unclear whether such restrictions foreclose from competition *any* part of the relevant market. *See generally* ABA Antitrust Section, Monograph No. 8, *Vertical Restrictions Upon Buyers Limiting Purchases of Goods from Others,* 92 (1982); Richard M. Steuer, *Exclusive Dealing in Distribution,* 69 Cornell L.Rev. 101, 118–124 (1983); Herbert Hovenkamp, *Federal Antitrust Policy* § 10.8 at 391 (1994) (foreclosure of even "a large percentage of one mode of distribution will have little anticompetitive effect if another mode is available.")

The record contains undisputed evidence that direct sales to end-users are an alternative channel of distribution in this market. Gilbarco, Dresser Wayne, Tokheim, Schlumberger and Bennett respectively make 30%, 73%, 35%, 15%, and 15% of their sales without the aid of distributors. The plaintiffs' own expert testified that these direct purchases fall within the relevant market.

The record also contains undisputed evidence of potential alternative sources of distribution. Existing companies, such as the service contractors that regularly sell and service petroleum dispensing equipment, can and do become authorized dispenser distributors. ATS, for example, was an ASC before becoming an authorized Gilbarco distributor, and neither it nor Kelley had been distributors prior to becoming Gilbarco distributors. Their own experiences refute their theory.[5]

■ Contrary to plaintiffs' contention, these alternatives are relevant to assessing market foreclosure. *See* 2A Areeda ¶ 570b1 (foreclosure calculation "includes the full range of selling opportunities reasonably open to rivals, namely, all the product and geographic sales they may readily compete for, using easily convertible plants and marketing organizations"); *cf. Thurman Industries, Inc. v. Pay 'N Pak Stores, Inc.,* 875 F.2d 1369, 1374 (9th Cir.1989) (relevant market includes "all sellers or producers who have actual or potential ability to deprive each other of significant levels of business"); *Oltz v. St. Peter's Community Hospital,* 861 F.2d 1440, 1446 (9th Cir.1988) (relevant product market includes things that "enjoy reasonable interchangeability of use and cross-elasticity of demand."). These alternatives eliminate substantially any foreclosure effect Gilbarco's policy might have. Omega nonetheless complains that they are inadequate substitutes for the existing distributors: "[A]lmost all [of] the 500 existing distributors-who have proven finances, abilities and customer relationships-are restricted by exclusive dealing." The short answer is that the antitrust laws were not designed to equip the plaintiffs' hypothetical competitor with Gilbarco's legitimate competitive advantage. *General Business Systems v. North American Philips Corp.,* 699 F.2d 965, 979 (9th Cir.1983)("[A] defendant, having succeeded in legitimately controlling 'the best, most efficient and cheapest source of supply,' ... does not have to share 'the fruits of its superior acumen and industry.' ")(citing *Determined Productions, Inc. v. R. Dakin & Co.,* 514 F.Supp. 645, 648 (N.D.Cal.1979)); *Seagood Trading Corp. v. Jerrico, Inc.,* 924 F.2d 1555, 1573 (11th Cir.1991)(no anticompetitive impact where plaintiffs not foreclosed from every alternative). Competitors are free to sell directly, to develop alternative distributors, or to compete for the services of the existing distributors. Antitrust laws require no more.

Second, the short duration and easy terminability[6] of these agreements negate substantially their potential to foreclose competition. *See Roland,* 749 F.2d at 394–95 (one-year contracts presumptively legal); *Paddock Publications, Inc. v. Chicago Tribune Co.,* 103 F.3d 42, 47 (7th Cir.)(Easterbrook, J.)(same), *cert. denied,* —— U.S. ——, 117

---

5. The ASCs do not operate under exclusive arrangements, which renders them even more accessible to competitors.

6. Paragraph 11(a) of Gilbarco's Domestic Distributor Agreement provides:

This Agreement shall have an initial term of one (1) year from the date first written above and continue thereafter until terminated. Either party shall have the option to terminate this Agreement, with or without cause, at the end of such initial term or at anytime thereafter upon sixty (60) days prior written notice.

**1164**

S.Ct. 2435, 138 L.Ed.2d 196 (1997); *Barry Wright*, 724 F.2d at 237 (two-year contracts reasonable); *U.S. Healthcare, Inc. v. Healthsource, Inc.*, 986 F.2d 589, 596 (1st Cir.1993)(termination on 30 days notice normally a *de minimis* constraint); *In re Beltone Electronics Corp.*, 100 F.T.C. 68, 210 (1982)(termination on thirty days notice an "escape valve" diluting the limitation on access to distributors). Because *all* of Gilbarco's distributors are available within one year, and *most* (90% according to the plaintiffs) are available on 60 days notice, a competing manufacturer need only offer a better product or a better deal to acquire their services. *See* 2A Areeda ¶ 420c at 60 ("Antitrust ... regards impediments as 'barriers' if they deter entry for a sufficiently long time."); *id.* ¶ 421f at 68 ("[A]ll customers might contract to buy exclusively from incumbents and yet allow effective entry if 20 percent of the contracts expire monthly (or even annually).").

Plaintiffs' expert opined that no distributor would abandon the Gilbarco line for an untested product with no reputation. We agree with the unremarkable proposition that a competitor with a proven product and strong reputation is likely to enjoy success in the marketplace, but reject the notion that this is anticompetitive. It is the essence of competition. *See American Professional Testing Service, Inc. v. Harcourt Brace Jovanovich Legal and Professional Publications, Inc.*, 108 F.3d 1147, 1154 (9th Cir.1997)("[R]eputation alone does not constitute a sufficient entry barrier in this Circuit."); *United States v. Syufy Enterprises*, 903 F.2d 659, 669 (9th Cir.1990)("We fail to see how the existence of good will achieved through effective service is an impediment to, rather than the natural result of, competition.").

Nor did plaintiffs produce credible evidence to support their contention that Gilbarco's policy actually deterred entry into this market.[7] The actual entry and expansion of Schlumberger in 1991, through the purchase of a small dispenser manufacturer, South-

west, demonstrate the contrary. The record shows that Schlumberger has built a substantial distribution network since it entered the market. Plaintiffs' witnesses testified that when Schlumberger bought Southwest, it "didn't have much distribution," and was "the joke of the industry," but that by trial Schlumberger had "something over ... 100 distributors" (which plaintiffs now count as among those with "proven finances, abilities and customer relationships"). And, although the parties contest the extent of the increase, it is undisputed that Schlumberger's market share has increased since its entry by at least one third (from approximately 6% to 8%), while industry output in the retail dispenser market has expanded substantially. This undisputed evidence precludes a finding that exclusive dealing is an entry barrier of any significance. *Syufy Enterprises*, 903 F.2d at 665.

Our discussion of the mitigating effect of the contracts' short duration and easy terminability also disposes of plaintiffs' contention that the agreements harm competition by facilitating tacit price coordination among dispenser manufacturers. They argue, essentially, that exclusive dealing limits the ability of distributors to extract lower prices from manufacturers by forcing the manufacturers to bid against each other. If the policy facilitates collusion by limiting the distributors' ability to obtain better prices, it does so in most cases for no more than 60 days. *See* Hovenkamp § 10.8b at 384–85 (Although "[e]xclusive dealing may facilitate collusion by denying buyers an opportunity to force sellers to bid against each other," if the "contracts must be re-bid frequently, most of the benefits of exclusive dealing will be retained, but the competitive threat will be greatly diminished.").

Nor are we persuaded that a jury could reasonably infer probable injury to competition even in this highly concentrated market where the undisputed evidence shows increasing output, decreasing prices, and significantly fluctuating market shares among

---

7. Plaintiffs contend that Koppens and Tatsuno, two foreign dispenser manufacturers, were deterred by exclusive dealing, but cite no credible supporting evidence. The testimony of Roy Sutton, president of Goode–Omega, that Koppens' entry failed due to a lack of distribution is insuffi-

cient for two reasons. First, it was admitted speculation, which the jury was not entitled to credit. Second, even if the jury were entitled to rely on his testimony, it is insufficient to establish that exclusive dealing caused the failed distribution.

the major manufacturers. *Cf. Brooke Group,* 509 U.S. at 237, 113 S.Ct. at 2595 (holding that, under Robinson–Patman Act, jury may not infer conscious parallelism or supracompetitive pricing even in highly concentrated industry where output is expanding and prices are *increasing* ).

We conclude that, even construed in the light most favorable to Omega, the evidence presented did not support the jury's verdict. The district court erred by denying Gilbarco's motion for judgment as a matter of law on the Clayton Act claim.[8]

## B. State Law Claims

### 1. Breach of contract

■ In the only contract claim submitted for its decision, the jury found that Gilbarco had breached ¶ 8(a) of the agreements, which requires compliance with "all applicable laws," by enforcing the exclusive dealing policy allegedly in violation of N.C.Gen.Stat. § 75–5(b)(2).[9] Gilbarco contends that it was entitled to judgment as a matter of law because North Carolina law is not "applicable" to the enforcement of Gilbarco's policy outside of North Carolina and, even if it is, Gilbarco did not violate the statute. Because we conclude that plaintiffs failed to demonstrate that Gilbarco violated the statute, we need not examine its extraterritorial reach.

■ Exclusive arrangements violate this statute only when they absolutely prohibit dealing in competitive goods. *McDaniel v. Greensboro News Co.,* 1984–1 Trade Cas. (CCH) ¶ 65,792 at 67,287 (M.D.N.C.1983)(citing *Arey v. Lemons,* 232 N.C. 531, 61 S.E.2d 596, 600 (1950)); *Baynard v. Service Distributing Co. Inc.,* 78 N.C.App. 796, 338 S.E.2d 622, 623 (1986)("Plaintiff was not allowed to and did not buy gasoline from any other

source."); 14 Julian O. von Kalinowski, *Antitrust Laws and Trade Regulation* § 165.01[3] (1996). Here, undisputed evidence shows that the plaintiff distributors could and did sell the dispensers of competing manufacturers. The policy prohibited them only from becoming *authorized distributors* of a competing line of dispensers. Because the policy is not an absolute prohibition on dealing in competitive goods, but only a restriction on how plaintiffs may deal in those goods, as a matter of law, it does not violate § 75–5(b)(2).

### 2. Negligent misrepresentation

■ ATS and Kelley argued that, notwithstanding the short-term, expressly terminable agreements, Gilbarco induced them into making capital investments, hiring more employees, and buying additional inventory by stating that they had long-term "partnering" relationships based on mutual trust. Washington follows the *Restatement (Second) of Torts* § 552 (1977), which provides:

> One who, in the course of his business, profession or employment ... supplies false information for the guidance of others in their business transactions, is subject to liability for pecuniary loss caused to them by their justifiable reliance upon the information, if he fails to exercise reasonable care or competence in obtaining or communicating such information.

*Havens v. C & D Plastics, Inc.,* 124 Wash.2d 158, 876 P.2d 435, 447 (1994). "The proof must be clear, cogent, and convincing." *Id.* (citation omitted).

Soon after the plaintiffs signed their agreements with Gilbarco, they received welcoming letters to the "Gilbarco Team" and saying that Gilbarco looked forward to their "partnership."[10] Two Gilbarco executives testi-

---

8. The Washington exclusive dealing statute, Wash. Rev. Code § 19.86.050, contains language substantially similar to the Clayton Act, and the plaintiffs' unfair competition claim under Wash. Rev. Code § 19.86.020 is premised on exclusive dealing. Because construction of these provisions is to be "guided by final decisions of the federal courts ... interpreting the various federal statutes dealing with the same or similar matters," Wash. Rev. Code § 19.86.920, our conclusion with regard to the Clayton Act claim disposes of these claims.

9. The statute renders it "unlawful for any person ... to [sell], or to have any contract ... [t]o sell any goods in this State upon condition that the purchaser thereof shall not deal in the goods of a competitor." The statute was repealed "to ensure" that North Carolina's antitrust laws are "consistent with federal antitrust laws." 1995 N.C. Sess. Laws 550.

10. John Reynolds testified that while he was negotiating for his distributorship, Gilbarco's district manager told him that he "was looking for a long-term distributor. As their agreement or their letter says, a partnership."

fied that it generally looked for and valued long-term "partnership-type" relationships, and one testified that "partnership" was a common theme.

These statements cannot establish negligent misrepresentation under Washington law. In *Havens*, the plaintiff asserted a claim based on similar statements made by the defendant during employment negotiations. The Washington Supreme Court, affirming a directed verdict for the defendant, said:

> Defendants stated that they were looking forward to a long and prosperous future together, and Plaintiff testified that he told Defendants that he expected to remain at Northwest Composites until he retired.... [S]uch statements by defendants are consistent with the general expectation present in any such negotiation: the employer was hoping for and expecting a long-term, mutually satisfactory relationship.

876 P.2d at 444. Such statements, the court held, "cannot establish a promise on which to base a negligent misrepresentation claim." *Id.* at 447. We conclude that *Havens* requires reversal on the negligent misrepresentation claim.

### 3. Tortious interference

Omega argued, and the jury found, that by terminating ATS and Kelley, Gilbarco tortiously interfered with Omega's attempted acquisition of three Gilbarco distributors. In Washington, the elements of tortious interference are:

> (1) the existence of a valid contractual relationship or business expectancy; (2) knowledge of the relationship or expectancy on the part of the interferor; (3) intentional interference inducing or causing a breach or termination of the relationship or expectancy; and (4) resultant damage.

*Pleas v. City of Seattle,* 112 Wash.2d 794, 774 P.2d 1158, 1161 (1989)(en banc).

"The third element, intent, denotes purposefully *improper* interference." *Birkenwald Distrib. Co. v. Heublein, Inc.,* 55 Wash.App. 1, 776 P.2d 721, 726 (1989)(emphasis supplied). The plaintiff must prove that the defendant either pursued "an improper objective of harming the plaintiff" or used "wrongful means" that caused injury in fact. *Id.* 776 P.2d at 727 (quoting *Pleas,* 774 P.2d at 1163). "Asserting one's rights to maximize economic interests does not create an inference of ill will or improper purpose." *Id.*

Undisputed evidence shows that Gilbarco neither pursued an improper objective nor used wrongful means. Gilbarco, rightly or wrongly, perceived that Omega's acquisition of its distributors conflicted with Gilbarco's economic interests.[11] Under Washington law, it clearly had the right to decline to do business with the purchaser of its distributors. *Id.* To that end, it exercised its express contractual right to cancel its distribution agreement with ATS and Kelley after they were acquired by Omega.

### IV

### Plaintiffs' Cross Appeal

Plaintiffs cross appeal the summary judgment on their Sherman Act § 1 claims.[12] We review *de novo. Bagdadi v. Nazar,* 84 F.3d 1194, 1197 (9th Cir.1996).

In granting summary judgment on the plaintiffs' claim that the defendants engaged in a concerted refusal to deal, the district court concluded that plaintiffs (1) failed to produce evidence of concerted action sufficient to withstand summary judgment,

---

**11.** Omega cites to the testimony of Walter Gavin, sales manager of Gilbarco North America, in support of its argument. We believe that it succinctly demonstrates why Omega's claim fails as a matter of law:

> A: The policy had to do with dealing with competitors that were owned by competitors or dealing with companies that had multi brands of equipment. It so happened that Omega was a company that fit that description. [ ] We would have made the same decision if it were some other company rather than Omega....

> Q: And you knew it would interfere with Omega's ... ability to acquire other Gilbarco distributors, correct?
> A: Well, yeah, I guess it would do that. But I'm not interested in what is good for Omega. I'm interested in what is good for Gilbarco. And it's clear to me that dealing with Omega is not good for Gilbarco. Good luck, go out and compete.

**12.** Our conclusion in the main appeal obviates the need to address plaintiffs' other contentions.

and (2) failed either to allege facts sufficient to warrant application of the per se rule or to produce evidence to withstand summary judgment under the rule of reason. In a lone paragraph in their 55–page opening brief, plaintiffs contend that they proved that Rochester Petroleum and Gilbarco agreed to refuse to deal with Omega.[13] Only in their reply brief do they address the reasonableness of the alleged restraint. They contend that they could properly omit this contention from their opening brief "because the district court erred in concluding that the concerted action alleged here was not a per se violation."

We firmly reject the startling proposition that these plaintiffs were entitled *to assume* in their opening brief, unknown to this court and the defendants, that an essential element of the district court's holding was incorrect. Plaintiffs could *argue* that the court erred, but they neglected to do so. We decline to address an argument raised for the first time in the reply brief. *See Cross v. State of Washington,* 911 F.2d 341, 345 (9th Cir.1990). Because plaintiffs have failed to present a sufficient basis to reverse the summary judgment, we affirm.

No. 96–35153 **REVERSED, VACATED AND REMANDED.**

No. 96–35172 **AFFIRMED.**

No. 96–35594 **VACATED.**

PREGERSON, Circuit Judge, dissenting:

I dissent from the part of the majority's opinion that holds that the district court erred in denying Gilbarco's motion for judgment as a matter of law on the Clayton Act § 3 claim. The district court properly instructed the jury. Substantial evidence in the record supports the jury's verdict. In holding to the contrary, the majority misapplies the proper standard of review and misconstrues Supreme Court and Ninth Circuit precedent in articulating the elements of a Clayton Act § 3 claim.

The standard for reviewing a jury verdict is whether the jury verdict is supported by "substantial evidence," that is, such relevant evidence as reasonable minds might accept as adequate to support a conclusion. *See Murray v. Laborers Union Local No. 324,* 55 F.3d 1445, 1452 (9th Cir.1995), *cert. denied,* —— U.S. ——, 116 S.Ct. 1847, 134 L.Ed.2d 948 (1996); *see also Erickson v. Pierce County,* 960 F.2d 801, 804 (9th Cir. 1992) ("Challenges to the sufficiency of the evidence, and the denial of a motion for judgment notwithstanding the verdict, are reviewed de novo to determine if the plaintiff's claims were supported by substantial evidence."). The credibility of the witnesses and the weight of the evidence are issues for the jury and are generally not subject to appellate review. *See Murray,* 55 F.3d at 1452.

Thus, our duty is limited to determining if substantial evidence exists in the record to support the jury's verdict. The majority, however, cites only to those parts of the record that support its conclusion, and neglects to mention those facts that support the jury's verdict. This approach might be suitable for a trier of fact, but it is not suitable for a court of appeals that is reviewing the verdict of a properly instructed jury.

A fair reading of the extensive trial record shows more than substantial evidence to support each element of a Clayton Act § 3 claim.

Omega presented evidence to establish the following:

● Gilbarco dominates the retail petroleum dispenser market.

● The number of established distributors of retail petroleum dispensers in the United States is limited to five hundred.

● Gilbarco uses exclusive dealing arrangements to prevent its distributors from carrying any competing brands of retail petroleum dispensers.

● Gilbarco's use of exclusive dealing arrangements forecloses 38% of the total retail petroleum dispenser market.

● Gilbarco's use of exclusive dealing arrangements creates entry barriers for new

---

**13.** Plaintiffs also contend that they proved that Rochester and Gilbarco agreed to the exclusive dealing policy in restraint of trade. Our conclusion that Gilbarco's distributor policy did not violate the Clayton Act disposes of this conten-

tion. If an exclusive dealing arrangement "does not fall within the broader proscription of § 3 of the Clayton Act[,] it follows that it is not forbidden by [§§ 1 and 2 of the Sherman Act]." *Tampa Electric,* 365 U.S. at 335, 81 S.Ct. at 632.

manufacturers of retail petroleum dispensers.

● Gilbarco's use of exclusive dealing arrangements inflates the prices at which existing manufacturers sell retail petroleum dispensers to their distributors.

These facts constitute substantial evidence in support of the jury's verdict finding Gilbarco liable for violating § 3 of the Clayton Act.

## I. BACKGROUND

### A. The United States Market for Retail Petroleum Dispensers

A few firms manufacture the vast majority of the retail petroleum fuel dispensers sold in the United States. These firms are Gilbarco, Dresser–Wayne, Tokheim, and Schlumberger. Gilbarco has 55% of the market, Dresser–Wayne has 18%, Tokheim has 16.1%, and Schlumberger has 7.7%. Omega's expert, Professor Leffler,[1] testified that the retail petroleum dispenser industry is an oligopoly dominated by Gilbarco, with Dresser–Wayne and Tokheim being the other two significant manufacturers. In the past, several manufacturers of retail petroleum dispensers attempted and failed to enter the retail petroleum dispenser market in the United States because they could not obtain or create distributors.

Five hundred distributors sell and service petroleum fuel dispensers in the United States. These five hundred distributors specialize in parts and pieces "specific to the construction of underground fuel systems and the specialized materials used for building gas stations and fleet fueling or airport fueling systems."

These distributors offer over one hundred products and services, e.g., commercial gasoline dispensers,[2] POS systems, credit card readers, vapor recovery systems, canopies, and tanks. Of all the products offered by petroleum equipment manufacturers, the most important product is the petroleum dis-

penser. In the words of Gilbarco's sales manager for North America, "[petroleum dispensers] are the core of our business."

Gilbarco prohibits its distributors from carrying more than one brand of retail petroleum dispenser. Dresser–Wayne and Tokheim also have a policy of allowing their distributors to carry only one brand of retail petroleum dispenser. Gilbarco's standard contract with its distributors has an initial term of one year and is terminable on sixty days notice.

### B. Omega's Entry

In 1991, Omega attempted to introduce a new way to deliver petroleum dispensing equipment and services to buyers. It wanted to create a network of distributors and other service providers that could offer prospective buyers "one-stop" shopping. One advantage to such a network is that it would allow buyers to compare many different brands of products, including retail petroleum dispensers. According to Professor Leffler, Omega's plan offered an ideal way for a new entrant into the retail petroleum dispenser market to distribute its products.

Important in this one-stop shopping idea was recruiting distributors who could install the petroleum dispensers and service them over a long period of time. To this end, Omega contacted existing distributors of retail petroleum dispensers. One such distributor joined the Omega network because he believed he could purchase parts from Omega "at a very small markup cost ... as opposed to paying fifteen or twenty percent markup."

Gilbarco distributors who only carried one line of retail petroleum dispenser became worried about the possible effects of Omega's proposed venture on their businesses. One Gilbarco distributor testified at trial that he did not want to face competition from Omega as a company that could offer more than one

---

1. Professor Leffler is a Professor of Economics from the University of Washington. Professor Leffler has expertise in the subject of exclusive dealing arrangements.

2. A "retail" petroleum dispenser is sold by the manufacturer to an official distributor at a wholesale price, for re-sale by the distributor to

an end-user at retail price. A "commercial" petroleum dispenser is sold by an official distributor to a buyer at a price above wholesale. Distributors of different brands of "retail" petroleum dispensers can purchase "commercial" petroleum dispensers from each other at this higher price.

line of equipment, charge cheaper prices, and be the "Walmart" of the industry. This distributor was concerned that Omega distributors would gain sales at his expense by offering more choices to customers and "play[ing] one ... manufacturer [of retail petroleum dispensers] off against another to get lower prices."

A second Gilbarco distributor wrote a letter to Gilbarco stating the following: "I feel that a Gilbarco distributor purchased by Omega should be cancelled immediately. I repeat: They are very dangerous."

### C. Retaliation Against Omega

On December 7, 1993, representatives of Omega met with representatives of Gilbarco. In the December meeting, Omega disclosed that it planned to issue catalogs and "provide one-stop shopping for customers."

Gilbarco reacted negatively to the prospect of interbrand price competition for retail petroleum dispensers. Gilbarco's sales manager for North America testified that he feared that Omega might become a large enough distributor to insist upon volume discounts. Gilbarco also did not want Omega to publish throughout the marketplace the lower prices that Gilbarco was able to offer to major oil companies.

At a Gilbarco Distributor Advisory Council ("DAC")[3] meeting held on December 15, 1993, Gilbarco representatives expressed their concerns about Omega. Distributors at the Gilbarco DAC meeting stated that it would be difficult to compete against Omega. These distributors asked Gilbarco to cancel any distributorship that became a part of Omega.

Gilbarco reminded distributors of its exclusive dealing policy in a February 8, 1994, memorandum stating:

> [I]t is [Gilbarco's] general intention to continue to do business with service station equipment distributors who:
> — Sell only the Gilbarco line of retail dispensers;
> — Are not owned by competing companies; and

> — Sell in an export market only with the agreement of the local Gilbarco distributor.

## II. ELEMENTS OF A CLAYTON ACT § 3 CLAIM

Section 3 of the Clayton Act states that

> It shall be unlawful for any person engaged in commerce, in the course of such commerce, to lease or make a sale or contract for sale of goods ... or fix a price charged therefor, or discount from, or rebate upon, such price, on the condition, agreement, or understanding that the lessee or purchaser thereof shall not use or deal in the goods, wares, merchandise, machinery, supplies, or other commodities of a competitor or competitors of the lessor or seller, where the effect of such lease, sale, or contract for sale or such condition, agreement, or understanding may be to substantially lessen competition or tend to create a monopoly in any line of commerce.

15 U.S.C. § 14.

The type of contract at issue in this case is an exclusive dealing arrangement. "In practical application, even though a contract is found to be an exclusive-dealing arrangement, it does not violate the [Clayton Act] unless the court believes it probable that performance of the contract will foreclose competition in a substantial line of commerce affected." *Tampa Elec. Co. v. Nashville Coal Co.*, 365 U.S. 320, 327, 81 S.Ct. 623, 628, 5 L.Ed.2d 580 (1961). In determining whether an exclusive dealing arrangement violates § 3 of the Clayton Act, a factfinder should consider the following: (1) "the line of commerce, i.e., the type of goods, wares, or merchandise, etc., involved must be determined ... based on the facts peculiar to the case," (2) the area of competition, i.e. "the market area in which the seller operates, and to which the purchaser can practicably turn for supplies,"[4] and (3) whether "the competition foreclosed by the contract [constitutes] a substantial share of the relevant market." *Tampa*, 365 U.S. at 327–28, 81 S.Ct. at 628.

---

**3.** Gilbarco communicates to its distributors through its DAC. The other major manufacturers of retail petroleum dispensers also use DACs.

**4.** The Supreme Court in *Tampa* also referred to the area of competition as the "relevant market." *See Tampa*, 365 U.S. at 328, 81 S.Ct. at 628–29.

The critical issue in this case is the third *Tampa* factor: whether "the competition foreclosed by the contract [constitutes] a substantial share of the relevant market." *Id.* at 328, 81 S.Ct. at 628. Numbers alone do not decide the question. In discussing "substantiality," the Supreme Court instructed that

> [I]t is necessary to weigh the probable effect of the contract on the relevant area of effective competition, taking into account the relative strength of the parties, the proportionate volume of commerce involved in relation to the total volume of commerce in the relevant market area, and the probable immediate and future effects which pre-emption of that share of the market might have on effective competition therein.

*Id.* at 329, 81 S.Ct. at 629.

In *Tampa*, the Supreme Court noted that the challenged exclusive dealing arrangement in that case did not substantially foreclose competition in the relevant market in part because there was no "seller with a dominant position in the market" nor an "industry-wide practice of relying upon exclusive contracts." *See Id.*

The Supreme Court revisited the issue of substantial foreclosure of competition in *Jefferson Parish Hosp. Dist. No. 2 v. Hyde*, 466 U.S. 2, 104 S.Ct. 1551, 80 L.Ed.2d 2 (1984). In *Jefferson Parish*, the plaintiff anesthesiologist challenged the exclusive arrangement that a hospital had with a group of anesthesiologists whereby the hospital would allow only that group of anesthesiologists to provide services at the hospital. The Court ruled:

> The record sheds little light on how this arrangement affected consumer demand for separate arrangements with a specific anesthesiologist. The evidence indicates that some surgeons and patients preferred [plaintiff's] services to those of [defendants], but there is no evidence that any patient who was sophisticated enough to know the difference between two anesthesiologists was not also able to go to a hospital that would provide him with the anesthesiologist of his choice.

*Jefferson Parish*, 466 U.S. at 30, 104 S.Ct. at 1567.

In a concurring opinion, four Justices concluded that there was no substantial foreclosure on competition.

> A firm of four anesthesiologists represents only a very small fraction of the total number of anesthesiologists whose services are available for hire by other hospitals, and [the hospital] is one among numerous hospitals buying such services. Even without engaging in a detailed analysis of the size of the relevant markets we may readily conclude that there is no likelihood that the exclusive dealing arrangement challenged here will either unreasonably enhance the Hospital's market position relative to other hospitals, or unreasonably permit [the four anesthesiologists] to acquire power relative to other anesthesiologists. Accordingly, this exclusive dealing arrangement must be sustained under the Rule of Reason.

*Id.* at 45–46, 104 S.Ct. at 1576 (O'Connor, J., concurring).

*Tampa* and *Jefferson Parish* suggest that the court should consider the following general considerations in deciding whether a challenged exclusive dealing arrangement in a market forecloses a substantial share of that market: (1) the dominance of the seller; (2) the existence of an industry-wide practice of exclusive dealing; (3) the proportion of affected commerce in comparison to the entire market; and (4) the probable effect immediately and in the future of the exclusive dealing, including effects on the ability of the consumer to change products. *See Tampa*, 365 U.S. at 329, 81 S.Ct. at 629; *see also Jefferson Parish*, 466 U.S. at 30, 104 S.Ct. at 1567–68.

Determining if the foreclosure of the market here is substantial requires more than a review of individual considerations, however. Under the "Rule of Reason," the trier of fact must determine if the exclusive dealing arrangement is reasonable. *See Jefferson Parish*, 466 U.S. at 45–46, 104 S.Ct. at 1575–76 (O'Connor, J., concurring). "The reasonableness inquiry asks whether the restraint in question is one that promotes competition or one that suppresses competition." *Twin City Sportservice, Inc. v. Charles O. Finley & Co., Inc.*, 676 F.2d 1291, 1304 (9th Cir. 1982) (internal quotation marks omitted).[5]

---

5. Both *Jefferson* and *Twin City* involved examina-  tions of the anticompetitive effect of exclusive

The majority shortchanges the analysis required by *Tampa, Jefferson Parish,* and *Twin City* when it states that "exclusive dealing arrangements imposed on distributors rather than end-users are generally less cause for anticompetitive concern." Majority Opinion at 1162–63 (citing *Ryko Mfg. Co. v. Eden Services,* 823 F.2d 1215, 1235 (8th Cir. 1987)). In *Ryko,* the Eighth Circuit Court of Appeals asserted that a higher standard of proof of "substantial foreclosure" is required "[w]here the exclusive dealing restraint operates at the distributor level, rather than at the consumer level." *Ryko,* 823 F.2d at 1235.

There is no Supreme Court or Ninth Circuit precedent that adopts this rule. *Tampa, Jefferson,* and *Twin City* all call for individualized examination of an alleged substantial foreclosure. *See Tampa,* 365 U.S. at 329, 81 S.Ct. at 629 (listing several factors to consider in evaluating "substantiality"); *Jefferson,* 466 U.S. at 29, 104 S.Ct. at 1567 (calling for "inquiry into actual effect of the exclusive contract on competition"); *Twin City,* 676 F.2d at 1302 (holding that a defendant's antitrust liability depends on "the overall effects of a defendant's conduct in the relevant market"). These cases do not suggest that a different standard should be used to evaluate exclusive dealing arrangements depending upon whether they restrict end-users or distributors. It bears repeating that the ultimate issue is "whether the restraint in question is one that promotes competition or one that suppresses competition." *Twin City,* 676 F.2d at 1304. There is no reason to deviate from this standard by imposing a general presumption which fails to account for the unique circumstances of the market in question.

The majority also creates an unnecessary presumption by concluding that the short contract length and terminability on sixty days notice of Gilbarco's distributorship agreements "negate substantially their potential to foreclose competition." Majority Opinion at 1163 (citing *Roland Machinery Co. v. Dresser Industries, Inc.,* 749 F.2d 380, 394–95 (7th Cir.1984); *Paddock Publications,*

*Inc. v. Chicago Tribune Co.,* 103 F.3d 42, 47 (7th Cir.1996), *cert. denied,* —— U.S. ——, 117 S.Ct. 2435, 138 L.Ed.2d 196 (1997); *Barry Wright Corp. v. ITT Grinnell Corp.,* 724 F.2d 227, 237 (1st Cir.1983); *U.S. Healthcare, Inc. v. Healthsource, Inc.,* 986 F.2d 589, 596 (1st Cir.1993); *In re Beltone Electronics Corp. et al.,* 100 F.T.C. 68, 210 (1982)).

The majority's approach in coming to this conclusion fails to consider the context of the relevant market in which the exclusive dealing arrangements are used. Although the majority does not state a per se rule that any short term contract that is terminable on short notice *cannot* give rise to a violation under § 3 of the Clayton Act, I fear that such a rule may eventually emerge from the precedent created by the majority's opinion.

In discussing the short length and terminability provisions of the Gilbarco distributorship agreements, the majority cites to several out-of-circuit cases. Close scrutiny of those cases show that they do not necessarily support the majority's position.

In *Roland Machinery Co. v. Dresser Industries, Inc.,* 749 F.2d 380 (7th Cir.1984), the Seventh Circuit Court of Appeals reviewed a district court's preliminary injunction prohibiting a manufacturer of farm machinery from terminating its contract with a distributor. The manufacturer's reason for terminating was the distributor's decision to sell farm machinery from a competitor. The court in *Roland* held that the distributor had to prove two things in order to show that the exclusive dealing agreement was unreasonable:

> First, he must prove that it is likely to keep at least one significant competitor of the defendant from doing business in a relevant market. If there is no exclusion of a significant competitor, the agreement cannot possibly harm competition. Second, he must prove that the probable (not certain) effect of the exclusion will be to raise prices above (and therefore reduce output below) the competitive level, or oth-

dealing arrangements under section one of the Sherman Act. 15 U.S.C. § 1. In *Twin City,* we held that "a greater showing of anticompetitive effect is required to establish a Sherman Act violation than a section three Clayton Act viola-

tion in exclusive-dealing cases." *Twin City,* 676 F.2d at 1304 n. 9. Thus, less evidence is needed to preserve a jury verdict on a § 3 Clayton Act claim on appeal than would be needed to preserve a jury verdict on a Sherman Act claim.

erwise injure competition; he must show in other words that the anticompetitive effects (if any) of the exclusion outweigh any benefits to competition from it.

*Roland,* 749 F.2d at 394.

The court in *Roland* concluded that the distributor had not presented adequate evidence to meet this standard for purposes of the preliminary injunction. On the contrary, the evidence suggested that the competing manufacturer could not be kept out of the relevant market because of its size and dominance in the world market:

> [The competing manufacturer] is the second largest manufacturer of construction equipment in the world. Its total sales of such equipment are four times as great as [the manufacturer's]. Already it is a major factor in the U.S. construction equipment market; in some items it outsells [the manufacturer]. The nationwide practice of exclusive dealing has not kept [the competing manufacturer] from becoming a major factor in the U.S. market, apparently in a short period of time.

*Id.*

The *Roland* court speculated that the competing manufacturer was able to gain a competitive position because the exclusive dealing arrangements in that case were terminable on ninety days notice. *See Id.* It then stated that "[e]xclusive dealing contracts terminable in less than a year are presumptively lawful under section 3 [of the Clayton Act]." *Id.* at 395 (citing to ABA Antitrust Section, Antitrust Law Developments 98 (2d ed.1984); Sullivan, Handbook of the Law of Antitrust 485–86 (1977); *cf.* Marvel, Exclusive Dealing, 25 J. Law & Econ. 1, 6 (1982)). Nevertheless, the court in *Roland* did not "exclude the possibility that on the full record made in the trial on the merits, [the distributor] will succeed in establishing its claim." *Id.* at 396.

The decision in *Roland* is distinguishable. *Roland* involved a market where a new competitor had come into the market and was successfully competing. In addition, the new competitor had vast resources that dwarfed its rivals who were using exclusive dealing arrangements.

By contrast, the present case involves exclusive dealing arrangements used by Gilbarco, the dominant firm in the relevant market. Over time, few competitors have *successfully* entered the market.[6] Most importantly, the *Roland* court held that the distributor *might prove at time of trial* that the exclusive dealing arrangements, terminable on ninety days notice, did foreclose competition in the relevant market. The majority does not allow for that possibility in this case.

Furthermore, I do not agree with the holding made by the court in *Roland* that exclusive dealing arrangements that are terminable in less than a year are presumptively legal. The court in *Roland* cited to no case law and relied only on law review articles and other secondary authority in coming to this conclusion. I know of no Ninth Circuit precedent that supports the holding made by the *Roland* court. In addition, I believe that this presumption of legality for exclusive dealing arrangements that are terminable in less than a year is contrary to the Supreme Court's instructions in *Tampa,* which call for the trier of fact to make an individualized determination of the anticompetitive effects of an exclusive dealing arrangement in the particular relevant market. *See Tampa,* 365 U.S. at 327–28, 81 S.Ct. at 627–29.

Nor is the majority's citation to *Paddock Publications, Inc. v. Chicago Tribune Co.,* 103 F.3d 42 (7th Cir.1996), persuasive. In *Paddock,* the Seventh Circuit addressed a small newspaper's claim that its competitors' agreements with news services that allowed the news services to provide material only to the competitors violated § 3 of the Clayton Act. The court explicitly stated that *Paddock did not involve exclusive dealing arrangements.*

6. The majority points to the entry of Schlumberger as evidence that new manufacturers of retail petroleum dispensers could enter the United States market. The evidence presented at trial regarding Schlumberger was mixed. Professor Leffler testified that Schlumberger has *not* been successful in establishing a distribution network and still does not have representation in all parts of the United States. We are not free to disturb the jury's decision to believe the substantial evidence presented at trial that entry barriers do prevent new manufacturers from entering the United States retail petroleum dispenser market.

[T]his case involves exclusive *distributorships*. Despite the similarity in nomenclature [to the term "exclusive dealing"], there is a difference ... An exclusive dealing contract obliges a firm to obtain its inputs from a single source.... This was the genesis of the concern about foreclosure. A new [distributor of the product] could not find outlets. An exclusive distributorship, by contrast, does not restrict entry at either level. None of the newspapers in Chicago (or anywhere else) has promised by contract to obtain all of its news from a single source-and the sources have not locked all of their output together.... A new entrant to the supplemental news service business could sell to every newspaper in the United States, if it chose to do so.

*Paddock,* 103 F.3d at 46.

The majority cites to a sentence of dicta in *Paddock* which states that "the FTC and the Supreme Court concluded that even exclusive dealing contracts are lawful if limited to a year's duration." *Id.* at 47 (citing to *Federal Trade Commission v. Motion Picture Advertising Service Co.,* 344 U.S. 392, 395–96, 73 S.Ct. 361, 363–64, 97 L.Ed. 426 (1953)). The authority cited by the court in *Paddock* does not stand for this general proposition, however. In *Motion Picture,* the exclusive dealing arrangements in question were the agreements between distributors of films that advertised products for sales and theatre owners. Under the agreement, the theatre owner was to show only advertising films from a single distributor. In this case, four distributors had exclusive dealing contracts with seventy-five percent of the theatres in the United States. The exclusive dealing arrangements lasted up to five years. *See Motion Picture,* 344 U.S. at 393–94, 73 S.Ct. at 362–63.

The Supreme Court upheld a Federal Trade Commission decision to outlaw any exclusive dealing arrangements between distributors and theatre owners that lasted longer than one year. *See Motion Picture,* 344 U.S. at 393–96, 73 S.Ct. at 362–64. The Supreme Court upheld the Federal Trade Commission decision because the Federal Trade Commission came to this conclusion only after considering the *totality* of the circumstances in that case. *See Id.*

The Supreme Court also upheld the Federal Trade Commission's decision in *Motion Picture* to allow exclusive dealing arrangements that lasted only one year. The Supreme Court concluded that the Federal Trade Commission's findings for that particular case supported the determination that one-year exclusive dealing arrangements did not have unacceptable anticompetitive effects:

> The Commission found that the term of one year had become a standard practice and that the continuance of exclusive contracts so limited would not be an undue restraint upon competition, in view of the compelling business reasons for some exclusive arrangement.... The point where a method of competition becomes "unfair" ... will often turn on the exigencies of a particular situation, trade practices, or the practical requirements of the business in question.

*Id.* at 396, 73 S.Ct. at 364.

Thus, the Supreme Court in *Motion Picture* agreed with the Federal Trade Commission's determination that exclusive dealing arrangements lasting one year or less between distributors and theatre owners were legal where substantial evidence showed that the exclusive dealing arrangements were not an undue restraint and there were compelling business reasons to allow the exclusive dealing arrangements. *See Id.* In the present case, the jury found just the opposite.

The majority's citation to *Barry Wright Corp. v. ITT Grinnell Corp.,* 724 F.2d 227 (1st Cir.1983) is also inapposite. In *Barry Wright,* the court examined the legality of a buyer's agreement with a manufacturer to purchase a set amount of "mechanical snubbers." The First Circuit first noted that such a contract was not necessarily a contract that involved exclusive dealing:

> [The buyer] did not actually promise to buy all its requirements from [the manufacturer]; it entered into a contract for a fixed dollar amount. There is an important difference between a "requirements" contract and a contract which calls for the purchase of a definite quantity over a period of time which the buyer estimates to be sufficient to meet his requirements. A

true requirements contract flatly eliminates the buyer from the market for its duration; a fixed quantity contract leaves open the possibility that the buyer's needs will exceed his contractual commitment; he is free to purchase from others any excess amount that he may want.

*Barry Wright*, 724 F.2d at 237 (internal quotation marks and citation omitted).

Furthermore, the court rejected the argument that the snubber contract length of two years had anticompetitive effects. *See Id.* In the snubber marketplace, buyers had to place orders at least six months in advance of delivery. *See Id.* Thus, given the nature of the snubber market, a contract term of two years was not unreasonable. The court also noted that the manufacturer of the snubbers was in no position to foreclose new competition. *See Id.* The court considered many factors before finally concluding that the district court "could reasonably have concluded that the [contracts for mechanical snubbers] were not 'exclusionary.'" *Id.* at 238.

The facts of the present case are completely different from the situation presented in *Barry Wright.* First, there is no dispute that Gilbarco enforces *exclusive dealing* arrangements with its distributorships. Second, there is no suggestion that the petroleum dispenser market requires buyers to purchase retail petroleum dispensers well in advance of delivery. Third, Gilbarco has the greatest percentage of the market for retail petroleum dispensers and is in a position to foreclose new competition. Thus, *Barry Wright* does not support the majority's conclusion that contract terms that provide for short length and terminability on short notice "negate substantially [the] potential [of Gilbarco's exclusive dealing arrangement] to foreclose competition."

The majority's reliance on *U.S. Healthcare, Inc. v. Healthsource, Inc.*, 986 F.2d 589 (1st Cir.1993), is also misplaced. In *U.S. Healthcare, Inc.*, the First Circuit addressed an exclusivity arrangement whereby doctors agreed to serve only one particular HMO in exchange for higher compensation. *See U.S. Healthcare*, 986 F.2d at 592. The First Circuit rejected the appeal, in part, because the appellant in that case failed to discuss factors listed by the Supreme Court in *Tampa. See*

*Id.* at 595. The First Circuit noted that the following issues were simply not addressed:

First, the extent to which the clause operated economically to restrict doctors is a serious question. True, most doctors signed up for it; but who would not take the extra compensation when no competing non-staff HMO was yet operating? The extent of the financial incentive to remain in an exclusive status is unclear, since it varies with patient load, and the least loaded (and thus least constrained by the clause) doctors would normally be the best candidates for a competing HMO. Healthsource suggests that by relatively modest amounts, U.S. Healthcare could offset the exclusivity bonus for a substantial number of Healthsource doctors. U.S. Healthcare's reply brief offers no response.

*Id.* at 595–96.

The First Circuit also addressed the fact that the exclusivity clause for the contracts between HMO and doctor was of short duration. Although noting that such short term contracts would not usually violate § 3 of the Clayton Act, the *U.S. Healthcare* court ultimately recognized that determining if a violation occurred requires the consideration of many factors. *See Id.*

The majority's failure to adequately consider the totality of the circumstances *in addition to* the literal terms of the Gilbarco distributorship agreements is contrary to controlling Supreme Court and Ninth Circuit precedent. The better approach is to consider the overall reality of the marketplace according to the Rule of Reason. Although short length of contract and terminability on short notice are factors to weigh under the Rule of Reason, consideration of these two factors alone does not end the analysis required under *Tampa, Jefferson Parish,* and *Twin City.*

## III. SUBSTANTIAL EVIDENCE OF CLAYTON ACT § 3 VIOLATION

### A. First Two Tampa Factors: Defining the Line of Commerce and Area of Competition

In this case, the first two *Tampa* factors-the line of commerce and area of competi-

tion-consist of the sale of retail gasoline dispensers in the United States *to small independent buyers who purchase retail petroleum dispensers from distributors*. The majority incorrectly defines the line of commerce and area of competition as the sale of *all* retail petroleum dispensers from manufacturers. To understand why the relevant market does not include *all* sales of retail petroleum dispensers, it is important to understand the retail petroleum dispenser market.

The sale of retail petroleum dispensers to end-users occurs in two ways: (1) direct sales from manufacturers of petroleum dispensers to major oil companies and large convenience store chains; and (2) sales from distributors of petroleum dispensers to independent gasoline station owners, regional petroleum marketers, and small oil companies ("small independent buyers").

Major oil companies purchase retail petroleum dispensers from more than one manufacturer.[7] The major oil companies want to have more than one supplier to ensure an alternate source of petroleum dispensing products. Gilbarco gives some major oil companies discounts on retail petroleum dispensers.

Small independent buyers, in contrast, purchase retail petroleum dispensers from a single distributor and develop long-term relationships with that distributor. The key reason for the small independent buyers to stay with a particular distributor is that they want a single reliable source of service and products. One former distributor of Gilbarco retail petroleum dispensers explained:

> Well, major oil companies have engineers and consultants and experts that go out and inspect the stuff and lay it all out for them. These [buyers from distributors] were small business [people] who depended on me and my company to spec them the correct equipment that could be serviced and taken care of and not have to be worried about.

As a result of the small independent buyers' reliance on particular distributors, small independent buyers normally do not change

distributors. For example, the customer base of one Gilbarco distributor has not changed significantly in the last forty years.

This evidence shows that the sale of retail petroleum dispensers to small independent buyers is an entirely different market from the sale of retail petroleum dispensers to major oil companies. Unlike major oil companies, small independent buyers have strong reasons to buy from a single distributor. Nor is there any evidence in the record to suggest that small independent buyers have the option of purchasing retail petroleum dispensers directly from manufacturers such as Gilbarco. Gilbarco's own reluctance to allow discounts and dissemination of price information to small independent buyers-though discounts and price dissemination were common for major oil companies-shows that Gilbarco itself sought to maintain two distinct markets. By failing to recognize the substantial evidence in the record showing this bifurcation in the retail petroleum dispenser market, the majority incorrectly defines the line of commerce and area of competition.

### B. Third Tampa Factor: Substantial Foreclosure

#### 1. Dominance of Gilbarco

In the present case, the parties do not dispute that Gilbarco dominates the retail petroleum industry with a fifty-five percent market share. The three major manufacturers of retail petroleum dispensers in the United States-Gilbarco, Dresser–Wayne, and Tokheim-have almost ninety percent of the market. Omega presented expert testimony at trial to establish that these three manufacturers constitute an oligopoly.

#### 2. Industry–Wide Practice of Exclusive Dealing

The parties do not dispute that Gilbarco, Dresser–Wayne, and Tokheim use exclusive dealing arrangements in the retail petroleum dispenser market by prohibiting their distributors from selling competing brands of

---

**7.** Omega's witnesses testified about Gilbarco's relationship to the major oil companies. It is not clear from the record whether the term "major

oil companies" is meant to include large convenience store chains or refers only to major oil companies.

retail petroleum dispensers. Because Gilbarco, Dresser–Wayne, and Tokheim control almost ninety percent of the United States market, their common use of exclusive dealing arrangements constitutes an industry-wide practice.

### 3. Proportion of Affected Commerce in Comparison to Entire Market

The proportion of the market for retail petroleum dispensers affected by Gilbarco's exclusive dealing policies is significant. The majority recognizes that Gilbarco's exclusive dealing to distributors affected thirty-eight percent of all retail petroleum dispensers sold in the United States. If we look to the relevant market-the sale of retail petroleum dispensers to small independent buyers-the percentage is even higher. A market foreclosure of thirty-eight percent or more is enough to make a § 3 Clayton Act violation a possibility. *See Twin City,* 676 F.2d at 1304 (holding that 24% foreclosure was substantial under the facts of that case).

### 4. Probable Effect of the Exclusive Dealing

The majority accords considerable weight to its determination that Omega failed to prove that Gilbarco's exclusive dealing arrangements *actually* deterred entry into the market for retail petroleum dispensers. *See Jefferson Parish,* 466 U.S. at 29, 104 S.Ct. at 1567 (stating that to prove an unreasonable restraint of competition under the Sherman Act "necessarily involves an inquiry into the actual effect of the exclusive contract on competition"). Although an inquiry into actual effect is necessary, *Tampa* makes clear that a Clayton Act § 3 claim only requires proof of the *"probable* effect of the contract on the relevant area of effective competition." *Tampa,* 365 U.S. at 329, 81 S.Ct. at 629 (emphasis added). There is no requirement that *actual* deterrence be proved.

The majority states that the jury could not reasonably infer probable injury to competition "where the undisputed evidence shows increasing output, decreasing prices, and significantly fluctuating market shares among the major manufacturers." Majority Opinion at 1164–65. The majority's reasoning is not persuasive. Even assuming that the evidence at trial showed increasing output, the jury reasonably could have inferred probable injury to competition due to the substantial evidence of price distortion and entry barriers created by Gilbarco's exclusive dealing arrangements.

#### a. Price Distortion

Omega presented evidence to show that Gilbarco's exclusive dealing arrangements prevented the prices of retail petroleum dispensers from falling as much as they would have without the exclusive dealing arrangements. The exclusive dealing arrangements for retail petroleum dispensers allowed manufacturers of retail petroleum dispensers to avoid intense price competition among themselves. Moreover, despite some decrease in prices, the prices of retail petroleum dispensers did not change much over time suggesting price stagnation.

Professor Leffler testified that under certain circumstances, exclusive dealing may have pro-competitive effects, e.g., preventing free-riding and focusing a distributor's attention on a particular product. Professor Leffler concluded, however, that the exclusive dealing arrangements in the retail petroleum dispenser industry have no such pro-competitive effects.

#### b. Entry Barriers

Omega also presented substantial evidence that Gilbarco's exclusive dealing arrangements caused actual as well as probable injury by shutting out potential competitors. To understand how this antitrust injury occurs, one must understand the retail petroleum dispenser market.

Small independent buyers purchase retail petroleum dispensers from a single distributor and develop long-term relationships with that distributor. Small independent buyers stay with a particular distributor in part because they need a single reliable source of products and services.

The majority contends that manufacturers may sell retail petroleum dispensers in two ways *in addition* to using distributors: (1) direct sales, and (2) creating new distributors from the group of six hundred contracting and service companies in the United States

that work to build, install, and service equipment related to gas stations and fleet fueling or airport fueling systems.

For reasons already stated, direct sales of retail petroleum dispensers to small independent buyers is not a realistic possibility. Unlike major oil companies or large convenience store chains, the small independent buyer needs to buy retail petroleum dispensers from distributors in order to have a reliable source of products and services.

With regard to the majority's speculation that a manufacturer could enter the retail petroleum dispenser market by converting members of the group of six hundred contracting and servicing companies into distributors, the majority fails to consider Professor Leffler's testimony that the six hundred contracting and servicing companies were *not* a "serious" alternative to the existing group of five hundred distributors. Professor Leffler explained that this was so because the six hundred contracting and servicing companies were smaller firms that did not carry a full line of products and did not have established relationships with small independent buyers. Although the majority might prefer to believe the evidence to the contrary, this court is not free to revisit the conclusions reached by the jury where substantial evidence exists to support the jury's verdict.

Therefore, the only effective means of selling retail petroleum distributors to small independent buyers is through an existing distributor. There are only five hundred established distributors of retail petroleum dispensers in the United States. New entrants into the retail petroleum dispenser market need to gain access to this closed group of five hundred established distributors in order to sell to small independent buyers.

In order to gain access to this group of five hundred distributors, a new entrant theoretically has two options: (1) have existing distributors carry the new entrant's brand in addition to the brand of retail petroleum dispenser they already carry or (2) have distributors switch from their old brand of retail petroleum dispenser to the new entrant's brand. For the reasons stated below, neither of these options is a practical possibility.

### i) Carrying More Than One Brand

Exclusive dealing eliminates the possibility of distributors carrying more than a single brand of retail petroleum dispenser. Gilbarco effectively enforced exclusive dealing. If a Gilbarco distributor violated its exclusive dealing arrangement with Gilbarco, Gilbarco would then terminate its distributorship leaving the former distributor at least temporarily without any retail petroleum dispensers to sell to its small independent buyers. For example, after Kelley–Omega and ATS joined Omega, Gilbarco terminated its relationship with them.

### ii) Switching Brands

It is also difficult for existing distributors to switch brands. Although a Gilbarco distributor has the contractual right to terminate his exclusive dealing arrangement with Gilbarco on sixty days notice and switch to a new manufacturer, this contractual right means little. Professor Leffler explained:

> [A distributor's] business value, because of the absence of [its] ability to build up a relationship with any other supplier in this particular instance, is dependent on continuing a relationship with Gilbarco. That is something that is very unlike [other] distributors except in the situation of manufacture[r]-owned distribution in other industries . . . .

> [T]he distributor because of the exclusive dealing has, in effect, been locked into a particular brand . . . the value of his business is closely tied [to] a continuing relationship with that single supplier.

One Gilbarco official acknowledged that it was "very difficult for the distributor to switch from one line of pumps to another line of pumps and convince its customers that it knows what it's doing." Under these circumstances, the short term and easy terminability provisions of the exclusive dealing arrangements are irrelevant. No distributor would ever terminate voluntarily for fear of losing its customers and ultimately its business.

The fates of Kelley–Omega and ATS illustrate the dangers that distributors face when they switch manufacturers. After Kelley–

Omega and ATS joined Omega, and Gilbarco terminated their distributorships, Kelley–Omega and ATS lost customers. As Professor Leffler explained, exclusive dealing in the retail petroleum dispenser industry caused distributorships to be closely tied to a particular brand. When a small independent buyer sees that its distributor no longer has a relationship with that particular brand, the small independent buyer loses confidence and takes its business elsewhere. ATS saw its earnings drop from two million dollars a month to only fifty thousand dollars a month. Gilbarco's termination of ATS and Kelley–Omega caused other Gilbarco distributors to refuse to be acquired by Omega.

As the above discussion demonstrates, Omega presented substantial evidence at trial that Gilbarco's exclusive dealing arrangements prevented distributors from carrying more than one brand of retail petroleum dispenser or from switching brands. Thus, Gilbarco's exclusive dealing arrangements had the anticompetitive effect of preventing movement of distributors between manufacturers.

In summary, Omega presented substantial evidence showing that (1) the line of commerce is retail petroleum dispensers; (2) the relevant market is the sale of retail petroleum dispensers to small independent buyers; (3) Gilbarco dominated the relevant market; (4) exclusive dealing is widely practiced in the relevant market; (5) the proportion of the relevant market affected by Gilbarco's exclusive dealing arrangements is very significant; and (6) Gilbarco's use of exclusive dealing arrangements in the relevant market causes serious anticompetitive effects by keeping the price of retail petroleum dispensers artificially high and creating entry barriers to the relevant market for new entrants.

Looking at the totality of the circumstances as we are required to do under *Tampa, Jefferson Parish,* and *Twin City,* I believe that the record contains substantial evidence to support the jury's conclusion that Gilbarco's use of exclusive dealing arrangements tends to suppress competition in the relevant market and therefore violates the Rule of Reason.

## IV.  JURY INSTRUCTIONS

On appeal, Gilbarco argues that the district court's Instruction 15–D incorrectly instructed the jury on antitrust injury. Before the district court, Gilbarco objected to instruction 15–D because the instruction did not include the following language concerning causation:

> Even if you find that plaintiffs have established all of the other elements of their exclusive dealing claim, *plaintiffs have not proven antitrust injury unless they can show that Gilbarco's exclusive dealing policy was the cause of their injury,* if any, rather than ... their own lack of business acumen, efforts, organization, experience, or good fortune.

Gilbarco's objection to this instruction lacks merit. Instruction 15–D, as given by the district court, already had the following similar language concerning causation:

> In order for a plaintiff to recover on its first claim, plaintiff must prove an "antitrust" injury. *This means that a plaintiff must prove that it was injured as a result of the defendant's alleged exclusive dealing arrangement.* In order to prove that defendant caused antitrust injury, the plaintiff does not have to prove the dollar value of the injury. It requires only that plaintiff prove that it was in fact injured by defendant's alleged antitrust violation.

Both Gilbarco's proposed language and the language in Instruction 15–D make clear that the antitrust injury must have resulted from Gilbarco's alleged exclusive dealing arrangement. Although Instruction 15–D may not have been worded the way that Gilbarco wanted, "[a] party is not entitled to have the jury instructed in the particular language of his choice." *Brooks v. Cook,* 938 F.2d 1048, 1053 (9th Cir.1991).

No other specific objection to the jury instructions was raised in the opening briefs. Thus, one must conclude that the district court correctly instructed the jury on the § 3 Clayton Act claim.

## CONCLUSION

Omega presented substantial evidence that Gilbarco suppressed competition in the mar-

ketplace through its use of dealing arrangements that require its distributors to sell only Gilbarco retail petroleum dispensers to small independent buyers. Moreover, the district court correctly instructed the jury on the § 3 Clayton Act claim. Therefore, I would affirm the jury's verdict holding Gilbarco liable for violating § 3 of the Clayton Act and awarding damages.